**GEORGE FELDMAN MCDONALD, PLLC**
Rebecca A. Peterson (241858)
RPeterson@4-justice.com
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
Tel.: (612) 778-9595
Fax: (888) 421-4173

**EDTECH LAW CENTER PLLC**
Julie U. Liddell (*pro hac vice* forthcoming)
julie.liddell@edtech.law
W. Andrew Liddell (*pro hac vice* forthcoming)
andrew.liddell@edtech.law
904 Rio Grande Street, Suite 100
Austin, TX 78701
Telephone: +1 737 990 5875

*Attorneys for Plaintiffs*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| John Roe and Jane Roe, on behalf of themselves and their minor child, M.C.<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1. **Strict Liability – Design Defect**<br>2. **Strict Liability – Failure to Warn**<br>3. **Negligence – Design**<br>4. **Negligence – Failure to Warn**<br>5. **Negligence**<br>6. **Civil Rights Violation - 42 U.S.C. § 1983**<br>7. **Unfair Competition Law – Cal. Bus. & Prof. Code § 17200** *et seq.* |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

THE PARTIES ..................................................................................................................5

JURISDICTION AND VENUE ..........................................................................................6

FACTUAL ALLEGATIONS ...............................................................................................7

    I.    Google's Products are defective..................................................................7

        A.    Google's Products are dangerous by design. ......................................8

        B.    Product safety is bad for Google's bottom line. .............................13

    II.    Google's Products are dangerous by default when they could be safe by default...................................................................................................16

        A.    Google externalizes the burden of safety to schools, parents, and children...................................................................................16

        B.    A safe design of Google's Products is feasible.................................17

    III.    Google knowingly fails to warn of the dangers its Products pose to students. .................................................................................................21

        A.    Google fails to warn school personnel of the dangers its Products pose.......................................................................................21

        B.    Google also fails to warn parents about the dangers of its Products..........22

        C.    Google markets its Products as safe. ...............................................23

        D.    Google does not warn about the dangers of its Products because it would be bad for business.........................................................26

    IV.    Google's defective Products and failure to warn harmed M.C. and his family...........................................................................................26

        A.    Google's Products provided M.C. persistent internet access and recommended pornographic content to him, which caused him and his family lifelong harm. ...............................................26

        B.    Had Google designed for safety instead of prioritizing profit, M.C. and his family would not have been harmed....................................30

        C.    Had Google warned the District and the Roe family about the dangers of its Products, they could have kept M.C. safe. ..............................30

    V.    The inherent risks of danger in the design of Google's Products outweigh the benefits those Products provide students. .................................................30

        A.    Academic performance has plummeted. ..........................................32

        B.    Children and adolescents are suffering mental health harms......................37

     C.     Children are routinely and accidentally encountering online pornography at school. ........................................................................39

     D.     The inherent risks of Google's Products outweigh their benefits. ...............41

VI.     Google is a state actor as to the Products it operates in public schools. ..................41

VII.     California law applies to Plaintiffs' claims. ..........................................................44

CAUSES OF ACTION ...............................................................................................................45

FIRST CAUSE OF ACTION STRICT LIABILITY – DESIGN DEFECT (On behalf of Plaintiff M.C.) ........................................................................................................45

SECOND CAUSE OF ACTION STRICT LIABILITY – FAILURE TO WARN (On behalf of Plaintiff M.C.) ................................................................................................47

THIRD CAUSE OF ACTION NEGLIGENCE – DESIGN (On behalf of Plaintiff M.C.) .........49

FOURTH CAUSE OF ACTION NEGLIGENCE – FAILURE TO WARN (On behalf of Plaintiff M.C.) ........................................................................................................51

FIFTH CAUSE OF ACTION  NEGLIGENCE (On behalf of Plaintiff M.C.) ...............................53

SIXTH CAUSE OF ACTION 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (On behalf of Plaintiffs John Roe and Jane Roe) .......................................................55

SEVENTH CAUSE OF ACTION Cal. Bus. & Prof. Code § 17200 *et seq.* – California's Unfair Competition Law ("UCL") (On behalf of all Plaintiffs) ................................57

RELIEF REQUESTED ...............................................................................................................59

JURY TRIAL DEMAND ...........................................................................................................59

**INTRODUCTION**

1.      Google sells computers and related products for use by students in kindergarten through twelfth grade ("K–12") education. These products are defective and expose students to numerous harms.

2.      Plaintiff Minor Child ("M.C.") and his parents, Plaintiffs John Roe and Jane Roe, suffered serious and ongoing harm as a result of Google's indifference to the students who use its products and the rights of their parents.

3.      In 2012, Google began to colonize K–12 education in the United States and around the world. It developed an integrated suite of products for students, teachers, and school administrators through which it generates and collects vast amounts of personal information for its own benefit.

4.      Google's push into education began with a small suite of productivity tools and a notebook computer ("Chromebook") that flopped in the adult consumer market when it debuted in 2011. Google did not redesign those products for use by students before it began marketing them for use by school-aged children in K–12 education.

5.      Since then, Google's K–12-marketed products have grown to include Chromebooks, the ChromeOS operating system, Chrome browser, Google Search (which is also the default search engine of the Chrome browser), the cloud-based Google Workspace for Education suite of applications, and the Admin Console, a suite of administrative tools that are available to school personnel (collectively, "Products").

6.      M.C. was required to use Google's Products at his school.

7.      All of these Products are defectively designed for use by students such as M.C. in the compulsory setting of K–12 education.

8.      Google's Products are defectively designed because, out of the box, they grant students virtually unrestricted access to the internet, where Google knows students are likely to be exposed to harmful content, such as pornography and violence, and harmful communications, such as cyberbullying and sexual predation. Further, Google's search algorithms are designed to promote maximally "engaging" content, which frequently is content that is dangerous, especially for K–12 students.

9. Today, tens of millions of students use Google's Products as part of their schooling, from students as young as five to seniors in high school.

10. Google's Products thus pose unreasonable, avoidable, and serious risks of danger to those students. Instead of designing for safety, Google forces onto schools and parents the responsibility of making its Products less dangerous for students, and onto students the responsibility of not getting hurt while using them.

11. The scope and extent of the danger students face while using Google's Products are largely a function of the resources available to their school. Google provides tools that, if used, can make Google's Products somewhat less dangerous—but schools must pay extra for them. And settings within the Admin Console may be reconfigured to make the Products less dangerous—but they are inadequate and overwhelming: numbering over a thousand, they are ever-changing and difficult to navigate. Thus, many of the school administrators tasked with overseeing Google's Products lack the time and technical expertise to properly implement and maintain them. Unsurprisingly then, students attending schools with fewer resources are disproportionately at risk of harm.

12. Further, Google understands the power of default settings:[1] most people never change them.[2] By default, Google's Products offer students virtually unrestricted access to the open internet and its search results often promote harmful content. Those are intentional design choices. They maximize the financial benefit to Google, which makes money by collecting data from people as they use its Products.

13. Google could design its Products with a safety-first approach, with the most robust safety settings available and active on all Products by default. Further, Google could provide administrators the means to lift default restrictions as appropriate. Google could also redesign its search technology to not promote—and even suppress—content that is objectively harmful to children.

---

[1] *See* Lauren Feiner, "Google paid $26 billion in 2021 to become the default search engine on browsers and phones," CNBC (Oct. 27, 2023), https://www.cnbc.com/2023/10/27/google-paid-26-billion-in-2021-to-become-a-default-search-engine.html.

[2] *See* Meg Leta Jones, *The Character of Consent: The History of Cookies and the Future of Technology Policy*, The MIT Press (2024), at 177–82 (providing illustrative examples of technology companies' establishment and reinforcement of industry-preferred status quo through opt-out defaults).

14.    A safety-first design approach would alleviate administrative burdens, keep students safer, *and* support better learning outcomes. But Google does not design for safety because safe design does not serve Google's bottom line, which depends on the collection of user data as they navigate the internet. In other words, the incentives created by Google's data-monetization business model are directly adverse to child safety.

15.    In addition to marketing its defective Products to K–12 schools, Google fails to warn school administrators and parents about the dangers students face while using its Products, thereby preventing them from taking steps necessary to make those Products less dangerous and to make informed decisions about whether to allow students to use them at all. Google could warn of the dangers of its Products, but it does not because doing so would be bad for business.

16.    Google knows more about the intersection of human behavior and computing than any other company on the planet. Google also knows more about the dangers lurking on the internet, especially for children. Valued at roughly two trillion dollars, Google could make products that arrive safe out of the box for students of every age. Instead, it makes Products that are dangerous for all students because of the internet-first design that Google's data-monetization business model requires.

17.    This case is about one result of Google's dangerous design choices: using Google's Products, 11-year-old M.C. was introduced to pornography through his school-issued Chromebook, which ultimately led to an unhealthy addiction that severely harmed M.C. and his family.

18.    In March of 2020, Plaintiff M.C. was issued a Chromebook by his middle school to facilitate remote learning during the COVID-19 pandemic. The school required that he use the Chromebook. He was in sixth grade at the time.

19.    Soon after he received the Chromebook and unbeknownst to his parents, M.C. began encountering online pornography while using the Chrome browser. M.C. had not initially searched for pornography; instead, he had searched for information about characters from Pokémon, a media franchise popular among children. However, with each click, Google's search algorithms pushed M.C. toward increasingly sexual content, including "pornographic Japanime," which

produced sexually explicit images, and eventually to content depicting real people having sex.

20.    Upon discovering M.C.'s pornographic encounters, M.C.'s parents alerted school personnel, who responded that the third-party filter they used could not prevent M.C. from accessing pornographic content. M.C.'s parents also tried to prevent M.C.'s access at school and routinely monitored his use of the Chromebook at home.

21.    However, M.C.—who was required to continue using Google's Products in order to participate in his education, as Google knew when it marketed them to schools—continued to access pornography surreptitiously at school for years. The school continued to advise M.C.'s parents that they were unable to prevent such access.

22.    M.C.'s curiosity ultimately became an addiction that interfered with his ability to participate in school and other activities and his relationship with family and friends.

23.    Using Google's Products, M.C. engaged in other related dangerous online activities, such as sending money to strangers in exchange for sexually explicit photos and sharing personal information about himself with strangers, including his home address, thereby endangering him and his family.

24.    M.C.'s addiction became so severe that his parents enrolled him in a pornography addiction program, which proved ineffective.

25.    M.C.'s school placed his use of Google's Products on "high restriction" with the school undertaking extensive efforts to restrict M.C.'s access to the internet. The school represented to M.C.'s parents that a "high restriction" designation would prevent M.C. from accessing the internet entirely. But, given the defective design of Google's Products, M.C. was still able to access pornographic content through Google's Products.

26.    Only by withdrawing M.C. from public school and enrolling him in a low-technology charter school were M.C.'s parents able to protect M.C. from Google's dangerous Products.

27.    Google knew that students' use of its Products was necessary for students like M.C. to participate in their education, but it designed its Products in a way that endangered students anyway.

28.    The virtually unrestricted access to the internet that Google's Products provided M.C., combined with Google's dangerous search algorithms, harmed M.C. and his family.

29.    Google is responsible for the harm to M.C. and his family because it (1) marketed Products to schools that are not safe for use by students; (2) failed to warn educators, parents, and students of the dangerousness of its Products and instead marketed those Products as safe for use by students; and (3) failed to provide educators and parents tools necessary to make its Products safe. At a minimum, Google could and should design its Products in a way that prevents children like M.C. from being exposed to online pornography on their school-issued device—including by not algorithmically recommending such content ever, let alone in response to benign search queries.

30.    Google must be held to the same standard as any vendor that markets products to schools. It is Google—and not a child, his parents, or even his school—that is ultimately responsible for making every product intended for use by students safe out of the box for them to use.

31.    When parents send their children to school, they have a reasonable expectation that their children will be safe, including while they use school-issued digital products. When schools receive products intended for use by students—especially those marketed as safe—they have a reasonable expectation that those products are safe by design. When children attend school, they should be able to participate in their own education without being exposed to preventable dangers, some of which can cause lifelong harm, as in the present case.

32.    As one group of experts has observed, "[s]chools should not be places where educational technology titans exploit students, test new products, or reimagine education through their own techno-corporate ideals of personalization, efficiency, and profits."[3]

33.    Accordingly, Plaintiffs bring this Complaint for injunctive and monetary relief and make the following allegations based upon knowledge as to themselves and the acts of themselves and their minor child, and upon information and belief as to all other matters.

## THE PARTIES

34.    Plaintiff M.C. is a minor under the age of 18. At all relevant times, he has been domiciled in the state of Utah. He attended school in a Utah public school district. As part of his public schooling, he was required to use Google's Products, including a school-issued Chromebook.

---

[3] Daniel G. Krutka, *et al.*, "Don't Be Evil: Should We Use Google in Schools?" *TechTrends* (2021), at 428, https://link.springer.com/article/10.1007/s11528-021-00599-4.

35.     Plaintiff John Roe is the father and legal guardian of Plaintiff M.C. At all relevant times, he has been domiciled in the state of Utah.

36.     Plaintiff Jane Roe is the mother and legal guardian of Plaintiff M.C. At all relevant times, she has been domiciled in the state of Utah.

37.     Defendant Google LLC was originally incorporated in California in September 1998 as Google Inc. and reincorporated in Delaware in August 2003. In or around 2017, Google Inc. converted to a Delaware limited liability company, Defendant Google, LLC (together with its predecessor-in-interest Google Inc., "Google"). On October 2, 2015, Google reorganized and became a wholly-owned subsidiary of Alphabet Inc., a Delaware corporation with its principal place of business in Mountain View, California.

## JURISDICTION AND VENUE

38.     Subject matter jurisdiction exists in this Court pursuant to 28 U.S.C. sections 1331 and 1343, and 42 U.S.C. sections 1983 and 1988.

39.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. sections 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and has general legal and equitable powers.

40.     Supplemental jurisdiction exists over the pendent state law claims pursuant to 28 U.S.C. section 1367.

41.     This Court has personal jurisdiction over Defendant Google because Google is headquartered in California.

42.     Venue is proper in this District under 28 U.S.C. section 1391 because Google is subject to personal jurisdiction here and regularly conducts business in this District.

43.     The conduct alleged in this Complaint occurred in, was directed to and/or emanated in part from this District. Google has sufficient minimum contacts with this state and sufficiently avails itself of the markets of this state through its promotion, sales, licensing, activities, and marketing within this state. Google purposely availed itself of the laws of California and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States.

44.     Further, one of Google's terms of use mandates that all "disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California," and that Google consents to personal jurisdiction in those courts. Google is headquartered in Santa Clara County, California, which is located within the Northern District of California.

## FACTUAL ALLEGATIONS

**I.      Google's Products are defective.**

45.     Google markets its Products for use by students in K–12 education, like M.C.

46.     Google was therefore required to design them in a manner that was safe for those intended users in that environment.

47.     Under California law, a product is deemed defective in design if (1) it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the inherent risks of danger in its design outweigh the benefits of the design. Assessing the risks of danger inherent in a product's design involves evaluating factors such as the gravity of the dangers posed by the design, the likelihood of such dangers, the feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from an alternative design.

48.     Google's Products are defective under both tests.

49.     Google's Products fail to perform as safely as an ordinary consumer would expect when used by students at in K–12 education because they provide students largely unrestricted access to the internet by default, where Google knows students are likely to be exposed to harmful content, such as pornography, violence, and predatory communications. Even more unexpected is that Google's search algorithms actually *push* students toward such content using information Google has collected about them while they use its Products.

50.     Further, the inherent risks of danger in the design of Google's Products do not outweigh the benefits of that design: (1) the dangers that broad internet access and algorithmically promoted harmful content pose to young students are severe; (2) the likelihood that students will encounter harmful content and frequently access such content is high; (3) Google could have designed its

Products to optimize for student safety instead of student-data collection; and (4) a safer design would not impede any legitimate educational benefits Google's Products provide students.

51.    Google must be held to account for knowingly designing dangerous Products and marketing them as safe for use by students in the compulsory setting of K–12 education.

**A.    Google's Products are dangerous by design.**

52.    Google's Products are designed to provide users broad access to the internet and promote extreme content to maximize engagement as follows:

53.    A Chromebook is a laptop computer that runs Chrome OS, the cloud-based operating system designed by Google.[4]

54.    Chrome OS is designed to support the Chrome browser, Google's web browser. The Chrome browser provides users access to the internet, allowing users to view and interact with websites and web applications ("apps"), such as those in Google's Workspace for Education, the cloud-based suite of apps Google markets to schools. The Chrome browser is thus, at its core, a gateway to the open internet.

55.    According to Google, Chrome OS and the Chrome browser were designed to facilitate fast, easy internet navigation for "users and businesses."[5] Some of those design choices include:

    a.    The hard drive has limited local-storage capacity to promote internet use and browsing efficiency.

    b.    ChromeOS directs user focus on the web browser.

    c.    The web browser is the "central hub" for accessing digital resources and applications.

    d.    The "app launcher" provides easy access to web-based applications.

    e.    The home screen prominently features a search bar providing users quick and simple access to the internet.

    f.    The top of the Chrome browser window features an "omnibox," a "multifunctional address bar and search bar" that enables users to access the internet.

    g.    Chromebooks are programmed to connect to the internet automatically.

---

[4] Other companies manufacture Chromebooks per Google's design specifications. Because this Complaint does not allege manufacturing defects, those companies are not a part of this case.

[5] Securities and Exchange Commission Form 10-K, Google Inc. (2011), at 5, https://www.sec.gov/Archives/edgar/data/1288776/000119312512025336/d260164d10k.htm.

h. ChromeOS displays notifications that encourage users to access the internet and provide links to websites, web applications, and other online services, based on data it collects from and about users.

56. Because Chromebooks are designed to support the Chrome browser and cloud-based websites and apps, they have limited or no local storage or offline capabilities.

57. Therefore, in order to properly function, Chromebooks require a persistent internet connection.

58. Google designed and initially marketed its Products for use by adults, but they were widely seen as a failure.[6] Only then did Google turn to the K–12 education market. However, Google did not meaningfully redesign its Products to optimize for K–12 student use.[7] Instead, they remained designed to optimize for broad internet use.

59. Students using Chromebooks can access and navigate the internet in several ways.

60. One common way students access the internet is by clicking on the Chrome browser widget, which is a persistent feature on all Chromebooks:



61. Another common way students access the internet is through the Uniform Resource Locator ("URL") bar, also known as the address bar, which is persistently featured in each of Google's web apps. The URL bar is a text field that displays the current webpage's address, or URL. Because Google's apps run within the Chrome browser, they persistently feature the Chrome browser's URL bar. And because its Products are designed to promote broad internet access, students can enter text into the URL bar and readily navigate the internet. For example, while a student is using the Google Drive app within Workspace for Education, he will see the address bar

---

[6] *See, e.g.*, David Pogue, "A Laptop, Its Head in the Cloud," *New York Times* (June 15, 2011) https://www.nytimes.com/2011/06/16/technology/personaltech/16pogue.html; Natasha Singer, "How Google Took Over the Classroom," *New York Times* (May 13, 2017), https://www.nytimes.com/2017/05/13/technology/google-education-chromebooks-schools.html.

[7] Google debuted in K-12 classrooms in 2012; in 2014, it dropped its company motto "don't be evil." *The Guardian*, "Google has 'outgrown' its 14-year old mission statement, says Larry Page" (Nov. 3, 2014), https://www.theguardian.com/technology/2014/nov/03/larry-page-google-dont-be-evil-sergey-brin

displayed at the top of the page:



62.    By simply entering text into the URL bar, a student can navigate the internet.

63.    Regardless of how students access the internet on their Chromebooks, when they search for online content using Chrome, Google Search is the default search engine that performs the search.

64.    The internet is inherently dangerous for children and adolescents. It facilitates access to harmful content and communications, such as websites and platforms intended exclusively for those 13 and older; explicit, obscene, and disturbing images and videos (as in this case); exploitative products and services designed to addict users; invasive data practices; and predation.

65.    Google's general artificial intelligence ("AI") model Gemini[8] identifies several risks of danger that students face when accessing the internet:

---

[8] According to Google, Gemini is Google's "most capable and general [AI] model." According to Google, Gemini can "generalize and seamlessly understand, operate across, and combine different types of information[.]" Google touts Gemini as "pushing the next frontiers" in AI, providing users "the best the web has to offer," and meeting Google's "high bar for information quality." Indeed, Google has integrated Gemini into the products it markets to K–12 schools, promoting it as "a helpful tool to enhance and enrich teaching and learning experiences." Google is "integrating Gemini capabilities like the Gemini app and NotebookLM into existing learning management systems, making it easier than ever for educators and students to teach and learn with AI." And Google just released a version of Gemini for use specifically by children under 13.

> ◆ **No, unrestricted access to the internet is not safe for children.** While the internet offers a wealth of educational and entertainment resources, it can also expose children to harmful content and online predators.
>
> Here are some of the risks associated with unrestricted internet access for children:
>
> - **Inappropriate content:** Children may encounter explicit, violent, or harmful content that can be upsetting or confusing.
> - **Online predators:** There are many online predators who target children, attempting to groom or exploit them.
> - **Cyberbullying:** Children can be victims of cyberbullying, which can have serious emotional and psychological consequences.
> - **Privacy concerns:** Children may share personal information online that could be used by malicious individuals.

66.     By providing users persistent, broad access to the internet, Google's Products as designed do not come safe out of the box for K–12 students.

67.     Compounding this dangerousness is that Google's search technology does not neutrally deliver search results from the internet. Instead, Google designs its search algorithms such that they *promote* dangerous online content.

68.     Google relies on proprietary algorithms to index the web. Google designs those algorithms to "personalize" web search results based on user data, including students using a school-issued Products.

69.     The data used includes things like the student's account information; Google account activity; the student's language and location; information about the student's device and operating system type; device, browser, and search settings; the student's internet search and web history; and specific session information, such as how the student interacts with the app or website and "click" data.

70.     Google uses this personal information to construct a psychographic profile of the student to analyze and predict the student's interests or potential interests in order to return results the student will find most engaging.

71.     Google uses the psychographic profile of the student to understand who the student is, what they like, how they behave, and what motivates them in order to maximize the time the

student spends online. That, in turn, enables Google to collect more data about the student. As Gemini explained, this profile is "central" to Google's data-collection scheme "that helps Google continually collect **more data** about the user."[9] This process is often described as a "data-driven feedback loop," in which "personalization is the hook."

72.    When asked whether Google's search algorithms ever recommend inappropriate content to young users, Gemini responded, "Yes, there is significant concern and evidence that algorithmic recommendation systems" can expose young users to inappropriate or harmful content. It then elaborated on "key areas of concern," describing Google's user-engagement imperative and how innocent searches can be steered toward harmful content:

### 1. The Nature of Recommender Systems

- **Maximizing Engagement:** Algorithms are fundamentally designed to maximize user engagement (clicks, watch time), which can unintentionally favor sensational, extreme, controversial, or emotionally charged content. 🔗

- **"Rabbit Holes":** Studies show that a user's initial, innocent interest (like fitness or a popular game) can lead the algorithm to amplify increasingly extreme or harmful content (e.g., from healthy eating to disordered eating content, or from self-improvement to misogynistic ideologies). This is often referred to as an "algorithmic rabbit hole." 🔗 🔗

73.    Algorithmic recommendations frequently include and amplify extreme content because it is highly effective at maximizing user engagement. Such content tends to be emotionally charged content that is polarizing and divisive; outrageous or fear-inducing; sensational or false; or intense or dangerous.

74.    Gemini explains that "[t]his algorithmic pushing can even occur when users do not explicitly seek out the more extreme material, as the system seeks to find the next thing that will maximize engagement."

75.    According to Gemini, pornographic content is "exceptionally engaging" because it produces dopamine in the user's brain:

---

[9] Because Gemini is Google's own artificial-intelligence technology, it is likely uniquely capable of providing information regarding Google's own policies, disclosures, practices, and products.

**1. High User Engagement and Addiction Potential**

Pornography is exceptionally engaging because viewing it triggers a release of **dopamine** in the brain, which is the neurotransmitter associated with reward and pleasure.

- This strong neurochemical response encourages **frequent and sustained viewing**, a key metric for engagement algorithms.

- The pursuit of sexual novelty in online pornography can lead to **"qualitative escalation"**—progressing to more stimulating or extreme genres—as users develop a tolerance for less intense content. This drive for novelty fuels the "extreme" end of the content spectrum.

76.     Gemini further observed that pornographic content can be "especially engaging" to young users "due to a combination of developmental, psychological, and environmental factors."

77.     In addition to adolescent development and curiosity, this content particularly appeals to teenagers because, according to Gemini, "[t]he brain's **dopamine system**, which is involved in reward, pleasure, and motivation, is generally **overactive** during adolescence," making teenagers "more susceptible to the compulsive use of pornography as the brain seeks to repeat the intense rush." It further notes that "[t]he structures of the teenage brain are also more malleable, meaning these experiences are more likely to cause long-term alterations to how their brains work."

78.     The result is that, based on their psychographic profile, even a student's benign search queries will likely produce highly and increasingly engaging content, such as pornography, and that the student will suffer long-term consequences from the exposure.

79.     Ensuring student safety requires robust gatekeeping. But Google designs its Products to do the opposite: its Products enable and encourage students to access and engage in online experiences, including—and especially—harmful ones.

80.     Therefore, Google's Products as designed are dangerous for use by K–12 students.

**B.    Product safety is bad for Google's bottom line.**

81.     Google is aware of these inherent dangerous design defects. Google has actual knowledge that it is marketing and distributing products to students that are not safe for them, like M.C. But Google ignores those defects and the harm they cause students, prioritizing data collection over student safety, as Gemini confirmed:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> While restricting internet access could make Chromebooks and Chrome OS safer for young children, it would also significantly impact Google's business model and the functionality of the devices.
>
> **If Google were to prioritize child safety over data collection, they would need to explore alternative revenue models and design Chromebooks and Chrome OS with a focus on offline functionality and privacy.** This could involve developing educational content and applications that work without an internet connection, as well as implementing stronger privacy protections.

82.     Therefore, Google's dangerous design choices are deliberate: they facilitate Google's core business of generating, collecting, and profiting from user data. In its own words, Google makes money by providing advertising technologies, which it builds using user data:

> **How We Make Money.** We have built world-class advertising technologies for advertisers, agencies, and publishers to power their digital marketing businesses. Our advertising solutions help millions of companies grow their businesses through our wide range of products across devices and formats, and we aim to ensure positive user experiences by serving the right ads at the right time and by building deep partnerships with brands and agencies[].[10]

83.     Google's education business is not philanthropic. And Google does not design the Products it markets to schools for use by children any differently than those it markets for use by adults. No matter the intended user, Google designs and optimizes its Products to collect user data, which it uses for commercial purposes, such as developing and marketing its own products and providing data and data-derivative products to third parties.

84.     As previously explained, the creation of a psychographic profile about users—including school-aged children—is central to Google's data-harvesting scheme. It acts as both a product of data collection and a tool that facilitates more data collection, creating an ever-more personalized "data feedback loop." This loop is highly valuable to Google and very dangerous for children.

85.     Google admits that it collects student data and that laws protecting such data are bad for business: it states that such laws "have resulted in, and may continue to result in . . . altered business

---

[10] Securities and Exchange Commission Form 10-K, Alphabet Inc. (2023), at 7, https://www.sec.gov/Archives/edgar/data/1652044/000165204424000022/goog-20231231.htm.

practices, limited ability to pursue certain business models . . . substantial costs, and civil or criminal liability."[11]

86.    In describing Chromebooks and Chrome to its shareholders in 2013, Google explained that they were "built around the core tenets of speed, simplicity, and security."[12] Safety was not a core tenet of those products. But that was the year that those products began gaining widespread adoption in K–12 education. Indeed, Google touted that "Chromebooks are used in more than 5,000 schools."[13] Children's safety, however, was not—and is not—a "core tenet" of Chromebooks or Chrome; it is a liability: As Google explained in the investor "Risk Factors" section, "laws restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to collect information from minors."[14]

87.    More than a decade later, Google still cites child-safety laws as a "risk factor" threatening the company's bottom line: "Additionally, legislators are increasingly focused on regulating online child safety, including content protections for minors under eighteen years of age. These regulations could result in our having to modify our products and services and incur additional costs to operate and monitor minors' experiences on our products and services."[15]

88.    Gemini echoed those statements, noting that designing Google's Products for safety would "significantly limit the amount and type of data Google could collect from" students:

> ◆ Yes, designing products specifically for younger students with a "safety-first" and "privacy-by-design" approach would very likely **significantly limit the amount and type of data Google could ethically and legally collect from those young users.**

89.    Further, Google knows more about the internet—and the dangers it poses to children—than any other entity in the world. Gemini agreed that, "Given its history, the scale of its operations,

---

[11] *Id.* at 18.

[12] Securities and Exchange Commission Form 10-K, Google Inc. (2013), at 3 https://www.sec.gov/Archives/edgar/data/1288776/000128877614000020/goog2013123110-k.htm.

[13] *Id.*

[14] *Id.* at 12.

[15] Securities and Exchange Commission Form 10-K, Alphabet Inc. (2024), at 19. https://www.sec.gov/Archives/edgar/data/1652044/000165204425000014/goog-20241231.htm.

and the nature of its core businesses, it is highly probable that Google, as a company, possesses a more comprehensive and detailed understanding of the content of the internet than any other single entity." It further confirmed that "it is almost certain that Google's vast knowledge of internet content includes a significant awareness of content that may be harmful or dangerous for children."

90.     As such, Google had a choice. It could design its Products either to be safe and less profitable or dangerous and maximally profitable.  It chose the latter.

**II.     Google's Products are dangerous by default when they could be safe by default.**

91.     Google's Products are designed to facilitate and promote broad internet access and algorithmically prioritize harmful content by default. They are thus inherently dangerous for use by K–12 students, like M.C.

**A.     Google externalizes the burden of safety to schools, parents, and children.**

92.     Google shifts the impossible burden of making its Products safe to school administrators, parents, and even to children themselves.

93.     Google provides administrative tools that, if properly used, can make its Products less dangerous than its free Products and its Products with default settings in place.

94.     Some of those tools are paid products, while others require reconfiguration of innumerable settings within Google's Products, especially the Admin Console.

95.     Even if a school has the resources necessary to utilize the administrative tools that Google offers to make Google's Products less dangerous for students to use, those tools are expensive, sprawling, complex, and ever-changing.

96.     Google also knows and should reasonably anticipate that the Products it markets to schools will be used by students at home. It thus has a duty to make its Products safe for use by students in the home environment as well.

97.     However, Google has failed to design its Products to support student safety while they use its Products off campus, including in their own homes.

98.     Google's administrative tools fail to keep children safe in that environment. School controls do not extend to the home network or to school-issued devices while off campus.

99.     One defect is that Google designs its school-marketed Products to *prevent* parents from

being able to access, monitor, and control those Products. For example, Google prevents parents from managing key safety settings that would enable them to exert some measure of control over the parameters of their child's internet access, such as tools for whitelisting, monitoring their child's Chromebook activity, or even disabling internet access entirely as parents see fit.

100.    Instead of designing safe Products, Google advises schools to educate students about online safety, though it emphasizes teaching "how to manage, rather than avoid, risks online."[16]

101.    Google suggests that parents "have open conversations with their children about online safety, responsible citizenship, and appropriate Chromebook use." Through such facially anodyne but insidious messaging, Google fosters a false narrative that, when children are harmed by Google's dangerously defective Products, parents are to blame. Calls for parental oversight are not a substitute for safe product design.

102.    Worst of all, Google purports to shift the responsibility of reducing the dangerousness of its Products to children themselves.

103.    Google provides a resource called "Be Internet Awesome," through which it purports to "empower" children "to make smart decisions" and "safely explore, grow, and play online," all while covertly recommending "engaging" harmful content to them.

104.    But the law does not allow companies to design and market inherently dangerous products to children—who lack the experience, maturity, and cognitive development to protect themselves—and "empower" them to "make smart decisions" about how to avoid danger while using them. The burden is on *companies* to ensure that their products are safe for use by children. Google ignores the law and designs products in the manner that best serves Google's financial interests at the expense of students' safety and wellbeing, all while implicitly blaming them when they are harmed.

### B.    A safe design of Google's Products is feasible.

#### 1.    Restrict internet access by default.

105.    Google's Products currently require school personnel to purchase additional products from

---

[16] Google Education, Future of the Classroom: Emerging Trends in K–12 Education, https://services.google.com/fh/files/misc/future_of_the_classroom_emerging_trends_in_k12_education.pdf.

Google or third parties, reconfigure myriad dynamic settings, monitor students' Chromebook use, and continuously educate students about internet safety.

106.    Instead of providing schools Products that are dangerous out of the box and leaving administrators, parents, and students like M.C. to fend for themselves, Google could and should design its Products to be, not just "safer," but *safe* out of the box for use by students.

107.    Specifically, Google could design its Products to fully restrict internet access by default, then provide administrator tools for gradually unrestricting access.

108.    As Gemini observes, "[a] strong argument can be made that the **default**" Products "**should be far more restrictive out-of-the-box**, prioritizing student safety by limiting internet access to a very controlled environment unless administrators *deliberately choose* to relax those settings."

109.    In other words, school personnel currently must take action to make Google's Products less dangerous, when Google could design its Products such that school personnel must take action to make its Products less safe.

110.    Far from eliminating any legitimate educational benefits students may receive from using Chromebooks, safety-first design choices would enhance those benefits.

111.    In addition to enabling administrators to relax default internet restrictions only as appropriate and more effectively control what students can access while using Chromebooks, products that optimize for safety would eliminate distracting, harmful internet browsing and promote development of meaningful computer skills, such as keyboarding, word processing, presentation design, file management, coding, and use of digital creativity tools.

112.    Beneficial digital content may also be made available to students in an offline format.

113.    Indeed, if Google were to design its Products to optimize for safety, the redesigned products would foster education services and content that would better serve students than its current offerings *and* keep them safe.  Instead, the dangerousness of Google's Products has fostered a market for tools designed to reduce that danger by limiting students' access to the internet, such as internet-restricting devices and software, administrator control and monitoring applications, content-filtering applications and services, and network security offerings. None of these tools, however, are completely effective at keeping children safe while using Google's Products.

1   Restricted internet access must be the default.

2   114.   Gemini observed that redesigning Google's Products in this manner might hinder access

3   to legitimate education resources and render those Products less useful for older students. But it

4   agreed that these challenges could be addressed by making the Products safe by default and then

5   providing administrators the features and tools necessary to make those Products less restrictive

6   and more appropriate for older students—the reverse of Google's current open-by-default design

7   paradigm:

8
    > Yes, that's a very logical and arguably the most effective approach: **design the products to be**
9   > **safe by default for the youngest users and then provide administrators with the granular**
10  > **controls to** *relax* **those restrictions for older students as appropriate.** This "restrictive by
    > default, open up as needed" philosophy directly addresses the challenges and considerations I
11  > previously outlined.

12

13  115.   It then identified several benefits of a restrictive-by-default design—such as achieving a

14  better balance between education and safety needs, flexibility for different age groups, simplified

15  management, and better alignment with child development. It even explained how the approach

16  could work in practice, including age-based account settings, granular controls for relaxation of

17  restrictions, and clear visual indicators of default safety settings.

18                       **2.      Redesign search algorithms to prioritize safety, not engagement.**

19  116.   In addition to restricting internet access by default, Google could also design its search

20  algorithms to optimize for student safety instead of engagement with Google's Products.

21  117.   Google does not publicly disclose information about the design and innerworkings of its

22  proprietary search algorithms. However, Google's Gemini suggested ways in which they could be

23  redesigned to prioritize student safety instead of data collection, as follows:

24  118.   Google could design its search technology such that results are not personalized by default.

25  119.   Google could eliminate the autocomplete feature from its search tool.

26  120.   Google could create a highly filtered index that excludes objectively harmful content.

27  121.   Google could create fully independent search index for K–12 Products that that acts as an

28  anonymizing proxy, stripping out all identifying metadata before queries interact with the main

1   Google search index.

2   122.    Google could employ advanced privacy-preserving techniques like federated learning to

3   train its search algorithms on decentralized, localized user data without ever accessing raw student

4   data.

5   123.    Google could employ differential privacy to add calculated noise to the model updates

6   before they are sent, preventing Google or third parties from to reverse-engineering the original

7   raw data from model updates.

8   124.    Google could redesign search to prioritize a user's stated preferences over algorithmically

9   perceived preferences.

10  125.    Google could redesign search to more neutrally prioritize results that are objectively

11  relevant to search queries rather than results that serve the data-harvesting imperative of Google's

12  business model. For example, Google could minimize commercially driven metrics like click-

13  through rates or time on platform in favor of metrics that prioritize safety and trustworthiness.

14  126.    Finally, Gemini suggested that Google could redesign search to provide greater

15  transparency around how the algorithmic ranking factors work to permit auditors to research the

16  effects of Google's search algorithms on systemic risks of harm, especially to young users.

17  127.    As with restricting internet access, redesigning search to promote results objectively

18  relevant to student search queries rather than results that maximize the time students spend online

19  would actually improve rather than reduce the educational value of Google's Products.

20  128.    As a technology company worth approximately $2,000,000,000,000,[17] Google at all times

21  possessed the technical and financial resources necessary to redesign its Products in a manner

22  would have prevented the harms to M.C.—and the harms that countless other students are

23  suffering around the world every day. At a minimum, Google could and should design its Products

24  in a way that does not actively recommend and expose children like M.C. to online pornography

25  on their school-issued device.

26

27  [17] That is, two trillion dollars. By comparison, federal, state, and local governments *combined* provide $878.2 billion annually to fund K–12 public education—about 40 percent of Google's market

28  capitalization. "U.S. Public Education Spending Statistics," *Education Data Initiative* (July 14, 2024), https://educationdata.org/public-education-spending-statistics.

**III.    Google knowingly fails to warn of the dangers its Products pose to students.**

129.    In addition to failing to design its Products in manner that is safe for all intended users, Google fails to warn about the dangers its Products pose to students.

130.    Nowhere among Google's voluminous and sprawling terms and policies does it warn that its Products are inherently dangerous for use by K–12 students by design.

131.    Google does not warn that its Products provide virtually unrestricted access to the internet by default and algorithmically promote "engaging" content, and the resulting foreseeable risk that children will be exposed to harmful content and communications such as pornography, violence, radicalization, bullying, and sexual predators.

      **A.    Google fails to warn school personnel of the dangers its Products pose.**

132.    Google fails to warn school personnel that failure to utilize available administrative safety tools and settings will subject students to substantial risks of danger while using its Products.

133.    Gemini provides several reasons why the information currently provided by Google is inadequate:

    a.    Multiple layers and interdependence of features;

    b.    Generic feature list;

    c.    Lack of age-specific warnings, guidance, or best practices;

    d.    Time constraints and resource limitations;

    e.    Assumption of technical expertise;

    f.    Assumption of proactive discovery;

    g.    Focus on solutions, not explicit warnings;

    h.    Focus on configuration, not inherent risk;

    i.    Use of technical jargon and complexity;

    j.    Use of marketing language;

    k.    Scattered information;

    l.    Downplaying out-of-the-box defaults;

    m.    Absence of real-world scenarios and case studies;

    n.    No built-in safety audit or checklist; and

    o.    Inadequate emphasis on the need for implementation and the risks of harm.

134.    According to Gemini, the "absence of a clear warning puts the burden of discovering and understanding these risks squarely on schools":

> In essence, the information Google provides is more of a technical manual for those who already understand the risks and know how to mitigate them. It lacks the clear, prominent, and easy-to-understand warning that would proactively inform schools—especially those with limited IT resources—about the inherent vulnerabilities their youngest students face when using Chromebooks in their default state. This absence of a clear warning puts the burden of discovering and understanding these risks squarely on the schools, which may not have the expertise or time to do so effectively.

**B.    Google also fails to warn parents about the dangers of its Products.**

135.    Because Google knows and should reasonably anticipate that its Products will be used in home environments, it has a duty to warn parents about the dangerousness of its Products, including M.C.'s parents.

136.    Instead, Google keeps parents in the dark: it does not warn them about the dangerousness of its Products, advise them of the risks of harm those Products pose to students, or notify them when their child is harmed.

137.    Because parents reasonably expect that the products their children use at school are safe, in the absence of a warning that Google's Products are not safe, parents reasonably expect that they are safe.

138.    Google falsely represents to schools that they—and not parents—are authorized to consent to the use of its Products by children under 13.

139.    Google also falsely represents that it is a "school official" under the Family Educational Rights and Privacy Act ("FERPA") for purposes of data collection to obviate the need for parental consent before students use its data-collecting Products.[18]

140.    Through these false and misleading statements, Google conscripts schools into furthering its scheme of concealing its policies, practices, and Products from parents.

---

[18] Although Google holds itself out as a "school official" and claims that it takes and uses data in compliance with the state-official exception to FERPA's parental consent requirement, it does not: Google does not obtain and use student data as contemplated by the school-official exception; schools do not control the maintenance and use of the personal information Google collects; and Google generates and collects personal information in excess of student education records as defined by FERPA.

141.    By failing to warn parents and failing to seek their consent, Google prevents them from undertaking efforts to protect their children from the dangers its Products pose and denies them the opportunity to decide whether to expose their children to such risks in the first instance.

142.    By denying parents information and choice, Google denies them their fundamental right to parent, including the right to protect their children from danger.

### C.    Google markets its Products as safe.

143.    Not only does Google fail to warn of the dangers of its Products, it markets them as safe.

144.    Google markets its Products to schools as age-appropriate when, in fact, it intentionally designs the Products to promote broad internet access and dangerous content so that Google may collect student data at the direct expense of their safety in order to serve its bottom line.

145.    The information Google provides the public about K–12 Chromebook internet design and functionality is limited. Its K–12 marketing materials instead focus on its Workspace for Education suite of apps, none of which describe how those apps provide students ready access to the internet.

146.    Instead, Google touts that Workspace for Education "puts your institution's safety and security first" and provides a "[s]ecure [] learning environment":

> Google Workspace for Education helps you enhance instructional impact, prepares students for the future, and puts your institution's safety and security first.
>
> Secure your learning environment, enhance instructional impact, and prepare students for the future with Google Workspace for Education.

147.    To the extent that Google discloses that its Products give children access to the internet, its representations leave the public with the impression that its Products are safe for that purpose.

148.    On its Google for Education Privacy and Security webpage, for example, Google states that its Products "create a safer digital learning environment for every school, every classroom, and every student":

1
2
3
4
5
6
7
8

**Safer digital learning with Google for Education**

Google for Education provides industry-leading education technology that helps create a safer digital learning environment for every school, every classroom, and every student. Maintain control of your school's data with tools that are secure by default and private by design.

9

Google states that "[e]very Google product is designed for safety":

10
11
12
13

**Every Google product is designed for safety.**

14

149.    Google claims that it enables users to search the internet safely:

15
16
17
18
19
20
21
22
23
24
25



26

150.    Google claims that it "keep[s] you and society at large safe" and that it prioritizes user safety

27

by detecting and preventing access to harmful, abusive, and illegal content "to create a safer

28

internet":

# Information and content
## you can trust.

At Google, we aim to balance delivering information with protecting users and society. We take this responsibility seriously. Our goal is to provide access to trustworthy information and content by protecting users from harm, delivering reliable information, and partnering with experts and organizations to create a safer internet.

Protecting you from harm    Delivering reliable information    Partnering to create a safer internet



# Protecting you from harm.

We keep you and society at large safe with advanced protections that not only prevent, but also detect and respond to harmful and illegal content.

151.    Google claims that Chromebooks are "perfect" for every student, from kindergartners to seniors in high school:



PERFECT FOR K-12

Chromebook

152.    Google has publicly stated that "[w]hen the Google for Education team designs products, we put the safety, security and privacy needs of our users first." It has proclaimed that "[e]verything we build is guided by three important principles: (1) Secure by default; (2) Private by design; and (3) You're in control."

153.    Google intends that these and other claims reach consumers, including school personnel, and persuade them of the safety of Google's Products.

154.    In stark contrast to these marketing representations, Google's shareholder disclosures describe child safety as a legal liability and impediment to commercial growth and profitability.

155.    The design of Google's Products supports the veracity of Google's federally mandated Securities and Exchange Commission disclosures over its marketing copy.

**D.    Google does not warn about the dangers of its Products because it would be bad for business.**

156.    While schools may be ill-equipped to understand and account for the dangerousness of Google's Products, Google could easily provide a warning to schools that makes the risks clear.

157.    Gemini observed that such a warning "would likely not be prohibitively expensive or unduly burdensome for Google."

158.    Despite the relative ease with which Google could warn, it does not, for the same reason it does not design for safety: it would be bad for business.

159.    According to Gemini, Google may decide not to warn because of "the potential negative impact on sales":

> ◆  Yes, the potential negative impact on sales is very likely a significant contributing factor to why Google does not currently provide a clear and prominent warning about the largely unrestricted nature of its Chromebooks "out of the box" for young users.

160.    Gemini then identified numerous factors supporting its conclusion, such as Google's desire to avoid complicated marketing, fear of deterring buyers, interest in maintaining a positive image, reliance on the "shared responsibility" argument, and prioritizing market penetration over ensuring student safety.

161.    Google thus fails to warn schools, parents, and students of the dangerousness of its Products—directly and substantially endangering students—simply to serve its bottom line.

**IV.    Google's defective Products and failure to warn harmed M.C. and his family.**

**A.    Google's Products provided M.C. persistent internet access and recommended pornographic content to him, which caused him and his family lifelong harm.**

162.    Because Google failed to (1) design its Products for safety, and (2) warn about the dangers those Products posed to children, M.C. was initially and routinely exposed to harmful content while using his school-issued Chromebook as intended and designed.

163.    M.C. was in sixth grade at a school within a Utah public school district (the "District"). The District provides its students with, and requires them to use, Chromebooks while at school and at home. M.C. first received a school-issued Chromebook in 2020—when he was eleven years old—which he used at all times relevant herein.

164.    That Chromebook came installed with ChromeOS, the Chrome browser, and Workspace for Education.

165.    Google did not inform M.C.'s parents that he was using Google's Products nor seek their consent for him to use its Products.

166.    On information and belief, Google did not warn M.C.'s school administrators about the inherent dangerousness of its Products.

167.    Google did not warn M.C.'s parents that its Products posed a danger to M.C., namely, by providing him persistent, broad access to the open internet by default or recommending pornographic content to him.

168.    The design defects of Google's Products introduced M.C. to online pornographic content, including sexually explicit images and videos, and enabled him to discover and access such content through a variety of websites.

169.    M.C. was first exposed to pornography unintentionally. While using his school-issued Chromebook, he used the Chrome browser to search for information about characters in Pokémon, a Japanese media franchise that features fictional animated creatures that are popular among children, especially children under 14.

170.    As M.C. continued his search, with each click, Google's algorithms pushed him toward increasingly sexualized content: what began with a search of "who was Ash's girlfriend" (Pokémon characters) quickly led to pornographic anime (a style of Japanese animation), which ultimately led to pornographic content depicting real humans engaging in sexual activity.

171.    As an 11-year-old boy, the psychographic profile Google generated about M.C. using his data likely suggested that this type of content would be "highly engaging" to M.C., causing Google's search algorithms to recommend and promote it during M.C.'s search. And because his developing brain was highly susceptible to the "rush" he experienced, M.C. quickly began compulsively accessing this dopamine-inducing content, beginning long-term alterations to his brain.

172.    After M.C.'s parents discovered that he accessed pornography using his school-issued Chromebook, they notified the District. School personnel informed them that, despite using a third-party filter, they were unable to prevent M.C. from accessing this and other forms of sexually

1    explicit content.

2    173.    Nevertheless, M.C. was required to use his Chromebook in order to participate in his

3    education and comply with school requirements.

4    174.    M.C.'s parents discussed with him the dangers of pornography and undertook substantial

5    efforts to restrict his internet access while he used his Chromebook, but they were unable to

6    control—or even monitor—his Chromebook activity while he was at school.

7    175.    M.C. continued to access pornography at school for years, easily devising workarounds to

8    administrative restrictions. The District continued to advise M.C.'s parents that they were unable

9    to prevent such access.

10    176.    During that time, M.C. was diagnosed with attention-deficit/hyperactivity disorder

11    ("ADHD"), autism, and generalized anxiety disorder.

12    177.    Using Google's Products, M.C. was also able to engage in other dangerous online activity

13    related to his pornography addiction, such as communicating with strangers about meeting to

14    engage in sexual activity, paying strangers for sexually explicit photos, and providing strangers

15    identifying personal information, including his home address, thereby endangering him and his

16    entire family.

17    178.    The problem became so severe that M.C. parents enrolled him in a pornography addiction

18    program, which ultimately proved ineffective.

19    179.    The harmful effects of M.C.'s chronic exposure to sexually explicit content resulted in M.C.

20    engaging in conduct that harmed himself and his entire family.

21    180.    When M.C. entered high school, his parents advised school personnel of his condition and

22    need to be supervised at all times when accessing the internet. In response, the school designated

23    his computer use as "high restriction."

24    181.    Because Google's Products are inherently defective, despite the school's efforts, M.C.

25    continued to access pornography at school using his school-issued Chromebook, again easily

26    devising workarounds to attempted administrative restrictions.

27    182.    Plaintiffs John Roe and Jane Roe have expended considerable resources to protect M.C.

28    while he was at home. For example, they installed a used a home internet filter; they routinely

1   manually reviewed his school-based internet usage when and to the extent possible; they password-

2   protected all other internet-enabled devices at home to restrict use to parent-supervised use (except

3   the school-issued Chromebook, which could not be similarly protected); they extensively educated

4   M.C. on internet and media safety, including leading a White Ribbon Week program, an

5   organization focused on internet and media safety in home and at school; and they installed a home

6   security system with cameras to monitor M.C.'s computer use.

7   183.    Despite these efforts, neither Plaintiffs John Roe and Jane Roe nor school administrators

8   could keep M.C. safe given the design defects in Google's Products.

9   184.    The only way his parents could protect him was by withdrawing him from public school

10  and enrolling him in a charter school that sharply limits students' use of digital technologies. Sadly,

11  M.C. and his family have suffered lifelong harm due to Google's dangerous Products.

12  185.    M.C.'s parents have expended and continue to expend considerable financial resources in

13  an effort to restrict his internet access, keep him safe, and treat his condition. Some examples

14  include paying for extensive individual and group therapy treatment for M.C.; cognitive and

15  psychological testing; technological products to prevent, monitor, and control M.C.'s internet

16  access; heightened security measures for their home; legal fees; and lost wages.

17  186.    Because M.C. was exposed to pornography at such a young age and was able to access

18  pornographic content regularly for years thereafter, M.C. will likely struggle with pornography

19  addiction and impulse control the rest of his life, which will result in extensive future expenses and

20  lost wages. These struggles will likely continue to diminish his ability to learn, work, and form and

21  maintain meaningful relationships with others and could lead to future dealings with law

22  enforcement and the criminal justice system.

23  187.    His addiction and related ongoing struggles are a direct result of Google's intentional and

24  dangerous design choices and failure to warn about the dangers its Products pose to children like

25  him.

26  188.    As a direct result of Google's action and inaction, M.C and his family has suffered and will

27  continue to suffer wide-ranging injuries and harm.

28

1

**B.    Had Google designed for safety instead of prioritizing profit, M.C. and his family would not have been harmed.**

2    189.    Had Google designed to protect K–12 students, M.C. would not have been introduced to

3    pornography at such an impressionable young age and not had broad ongoing access to the open

4    internet, including access to dangerous websites and platforms that host pornographic content, or

5    platforms that facilitate harmful communications with strangers.

6    190.    Had Google designed to protect children, school administrators and M.C.'s parents would

7    be able to easily restrict, monitor, and review his Chromebook activity.

8

**C.    Had Google warned the District and the Roe family about the dangers of its Products, they could have kept M.C. safe.**

9

10    191.    In addition to failing to design its Products for safety, Google also failed to warn of their

dangers.

11

12    192.    M.C.'s parents are deeply involved and invested in their children's education and wellbeing.

13    Yet, like millions of parents, when M.C. was issued his Chromebook, they were unaware that he

14    was in danger while using a school-issued computer. At a minimum, they believed he would not be

exposed—initially and routinely—to sexually explicit content and pornography.

15

16    193.    Had Google warned the Roes of the dangerousness of its Products, they would have heeded

that warning and taken steps to keep M.C. safe from the moment he was issued a Chromebook.

17

18    **V.    The inherent risks of danger in the design of Google's Products outweigh the benefits those Products provide students.**

19    194.    One framework for determining whether a product is defective in design is if the inherent

20    risks of danger in its design outweigh its benefits to the intended users.

21    195.    The inherent risks of danger posed by Google's Products as designed outweigh the benefits

22    of those Products to students, especially given the feasibility of a safer design that would provide

23    equal or better educational benefits.

24    196.    Beginning in 2012, Google began to widely introduce its Products into K–12 schools.

25    197.    Because Google's Products are designed to serve primarily as a portal to the internet rather

26    than as a traditional laptop with offline storage and capabilities, Google was able to sell them more

27    cheaply than competitor products.

28    198.    Thus, by 2014, millions of Chromebooks were being sold into K–12 schools annually.

199.    Google quickly overtook the incumbents that had previously controlled the K–12 digital learning market:[19]



200.    The COVID-19 pandemic and school closures only accelerated Google's control over the market.

201.    Today, tens of millions of students in the U.S. are required to use Chromebooks and other Google Products as part of their K–12 education.

202.    Google encourages schools to provide one Chromebook for each student, known as a one-to-one program. That arrangement encourages and often requires that students use them without adult supervision.

203.    Google's claims about how its Products have benefited children in the K–12 setting since that time are sweeping and vague. For example, Google states that its Products:

    a.   "transform teaching and learning";

    b.   "help[] expand learning for educators and learners";

---

[19] Singer, "How Google Took Over the Classroom."

c.  "set [educators and learners at every age and stage] up for success in building the future they want for themselves";

d.  will help "improve education";

e.  "provide students and teachers with quick access to educational tools and resources";

f.  "[c]reate engaging learning experiences";

g.  "[t]ransform education with Gemini";

h.  "help K–12 teachers and students create, collaborate, and build digital skills for the future"; and

i.  let "[s]tudents [] learn 21st-century problem-solving and the skills they'll use in their future careers[.]"

204.  Google highlights its commitment to positive-sounding but vague concepts such as "accessibility" and "equity" without explaining, in any meaningful sense, how students benefit from greater access to its Products.

205.  By contrast, a growing body of independent evidence suggests that K–12 students have not benefited from Google's Products.

206.  Research is revealing that, since 2012, when Google's Products began to proliferate in classrooms across the U.S. and around the world, children and adolescents have suffered a variety of academic, physical, and psychosocial harms.[20]

**A.  Academic performance has plummeted.**

207.  The adoption of Google's Products in schools and the transition to computer-based education that began in 2012 is correlated with a significant decline in student academic performance, both in the U.S. and abroad.

208.  Dozens of countries, including the U.S., participate in the Program for International Student Assessment ("PISA"). Created by the Organisation for Economic Co-operation and Development, PISA tests the skills and knowledge of 15-year-old students in mathematics, reading, and science, and asks subjective questions about students' wellbeing.

209.  Since 2012, scores in math, reading, and science have steadily fallen.

---

[20] Sharon Tsang, Excessive use of electronic devices among children and adolescents is associated with musculoskeletal symptoms, visual symptoms, psychosocial health, and quality of life: a cross-sectional study, *PubMed* (June 29, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10338872/.

210.    By 2021, scores had dropped to the lowest levels recorded since 2000:



211.    Trends in the U.S. show a similar drop in scores in math and reading.

212.    The Nation's Report Card shows that the steady gains in reading made by 13-year-old students in the U.S. since 1971 have been virtually erased since 2012:





213.    The most recent data from the Nation's Report Card shows that seniors' reading scores have dropped from 288 in 2013 to 283 in 2024:



214.    Likewise, the Nation's Report Card shows that, after steadily improving since 1971, the math scores of 13-year-old students in the U.S. rapidly declined beginning in 2012 to their lowest

levels since the early 1990s:[21]



215.    Even as more K–12 schools adopted digital tools like Google's Products, digital literacy rates among U.S. students declined.

216.    The International Computer and Information Literacy Study ("ICILS") measures 13-year-olds' readiness for today's digital learning and working environments.

217.    American students' performance in the ICILS fell significantly from 2018 to 2023.[22]

218.    The U.S. average score for computer and information literacy in 2023 was 482, down 37 points from an average score of 519 in 2018.[23]

219.    The U.S. average score for computational thinking in 2023 was 461, also down 37 points

[21] NCES (2023), *The Nation's Report Card: National Assessment of Educational Progress Long-Term Trend Assessment,* https://nces.ed.gov/nationsreportcard/data/; Haidt., J., Rausch, Z. (2025), *An EdTech Tragedy*, After Babel, https://www.afterbabel.com/p/edtech-tragedy.

[22] NCES, ICILS 2023 U.S. Results, https://nces.ed.gov/surveys/icils/icils2023/international.asp; NCES, ICLS 2018 U.S. Results, https://nces.ed.gov/surveys/icils/icils2018/theme1.asp; Merod, A. (2023), *8th graders' average scores decline on computer and information literacy exam*, K12Dive, https://www.k12dive.com/news/computer-literacy-us-scores-icils-nces/732613/.

[23] *Id.*

from an average score of 498 in 2018.[24]

220.    These declines in academic performance occurred even as per-pupil expenditures among K–12 students in the U.S. increased 56 percent since 2013, which includes expenditures on educational technology such as Google's Products:[25]



**Despite a 56% increase in national spending per student, U.S. NAEP scores have fallen**

Source: Edunomics Lab (2024), *ROI Over Time 2013-2024*, https://edunomicslab.org/roi-over-time/; Analysis by Edunomics Lab using data from these sources: Scores: The Nation's Report Card (NAEP) 2013-2024; Spending: U.S. Census Annual Survey of School System Finances through 2023; Inflation: CPI, BLS.

221.    The evidence does not suggest that Google's Products have benefited children's academic performance.

---

[24] *Id.*

[25] Edunomics Lab (2024), *ROI Over Time 2013-2024*, https://edunomicslab.org/roi-over-time/; Analysis by Edunomics Lab using data from these sources: Scores: The Nation's Report Card (NAEP) 2013–2024; Spending: U.S. Census Annual Survey of School System Finances through 2023; Inflation: CPI, BLS.

**B.    Children and adolescents are suffering mental health harms.**

222.    There is a mental health crisis among children in the U.S.[26]

223.    Science is increasingly linking that crisis to children's use of internet-connected devices.[27]

224.    School loneliness is an established predictor of low well-being and depression among adolescents. To measure school loneliness, PISA asked 15-year-olds six questions about loneliness at school: "I feel like an outsider (or left out of things) at school," "I make friends easily at school" (reverse-scored), "I feel like I belong at school" (reverse-scored), "I feel awkward and out of place in my school," "Other students seem to like me" (reverse-scored), and "I feel lonely at school." Response choices were "strongly disagree," "disagree," "strongly agree," and "agree."

225.    Rates of school loneliness doubled between 2012, when Google's Products were first introduced on a widespread basis, and 2018.[28]

226.    Social isolation has risen among all Americans since 2012, and adolescents and young adults have been disproportionately affected:[29]

---

[26] *See, e.g.,* Office of the Surgeon General (OSG) (2021), *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory [Internet]*, Publications and Reports of the Surgeon General, https://pubmed.ncbi.nlm.nih.gov/34982518/ ; and

Abrams, Z. (2023), *Kids' mental health is in crisis. Here's what psychologists are doing to help*, American Psychological Association, https://www.apa.org/monitor/2023/01/trends-improving-youth-mental-health .

[27] *See, e.g.,* Twenge J.M., Campbell W.K. (2018), *Associations between screen time and lower psychological well-being among children and adolescents: Evidence from a population-based study*, Preventative Medicine Reports,  https://pmc.ncbi.nlm.nih.gov/articles/PMC6214874/ .

[28] *See, e.g.,* Twenge J.M., Haidt J., Blake A.B., McAllister C., Lemon H., Le Roy A. (2021), *Worldwide increases in adolescent loneliness.* Journal of Adolescence, https://doi.org/10.1016/j.adolescence.2021.06.006

[29] Kannan, V.D., Veazie, P.J. (2023), *US trends in social isolation, social engagement, and companionship ─ nationally and by age, sex, race/ethnicity, family income, and work hours, 2003–2020*, SSM - Population Health, https://doi.org/10.1016/j.ssmph.2022.101331 .



227.    Incidences of major depressive episodes among children ages 12 to 17 have skyrocketed since 2012:[30]

---

[30] *National Survey on Drug Use and Health* (2023), Substance Abuse and Mental Health Services Administration. https://www.samhsa.gov/data/report/2021-nsduh-detailed-tables;

Rausch, Z., Haidt, J. (2024), [Anxious Generation:] The Evidence, https://www.anxiousgeneration.com/research/the-evidence.



228. The evidence does not suggest that Google's Products have benefited the mental health of K–12 students.

**C.   Children are routinely and accidentally encountering online pornography at school.**

229. Finally, M.C.'s case is not an outlier: research shows that his introduction to pornography—accidentally and while at school—is common among children.

230. A recent quantitative survey of more than a thousand children in the U.S. ages 13 to 17 revealed that nearly three in four teenagers have encountered online pornography, more than half of whom reported encountering it accidentally.[31] And accidental exposure occurs frequently: 63 percent of those teenagers reported that they had been accidentally exposed to pornography at least once in the past week:[32]

---

[31] Common Sense Media, *Teens and Pornography*, (2022), Report at 5, https://www.commonsensemedia.org/sites/default/files/research/report/2022-teens-and-pornography-final-web.pdf.

[32] *Id.* at 6.





231.     Further, almost a third of all teens who have seen online pornography have done so in school, 40 percent of whom report seeing it at least weekly.[33] Nearly one in five teens report having seen pornography *on a school-issued device.*[34]

232.     Indeed, controlling the online content that students can access through their school-issued devices is a challenge that has long plagued school personnel. That difficulty is exacerbated by internet-connected devices designed to keep kids online and off task, which educators have reported as even more distracting than personal cellphones.[35] As one high school teacher put it, "Giving some students a device is like asking an alcoholic to hold a drink—it's just too tempting."[36]

233.     In sum, research is showing that the omnipresence of internet-connected technologies such as Google Products are harming children and young people.

---

[33] *Id.* at 15.

[34] *Id.* at 16. Although the survey did not inquire about the specific technology the respondents used in accessing pornography, Chromebooks dominate the K–12 market. Nearly 60 percent of all K–12 schools used Chromebooks as of 2018, and that figure has climbed every year since then, spiking in 2020 during the COVID-19 pandemic. *See* Krutka, "Don't Be Evil," at 422.

[35] Laurain Langreo, Chromebooks or Cellphones: Which Are the Bigger Classroom Distraction? *Education Week* (May 9, 2025), https://www.edweek.org/technology/chromebooks-or-cellphones-which-are-the-bigger-classroom-distraction/2025/05.

[36] *Id.*

**D.    The inherent risks of Google's Products outweigh their benefits.**

234.    M.C. was harmed by Google's dangerous Products.

235.    The purported benefits of Google's Products that Google identifies are sweeping, vague, and unquantifiable.

236.    While these disturbing trends cannot be attributed entirely to use of school-issued internet-connected technologies such as Google's Products, the rapid adoption of and reliance on those technologies at school—where children spend a majority of their waking hours—*and* for schoolwork at home cannot be dismissed as a significant contributing factor.

237.    Thus, a growing body of evidence suggests that Google's Products have not benefited students' academic performance, cognition, or mental health.

238.    As detailed herein, Google could have designed its Products to both optimize for student health and safety *and* positive learning outcomes and healthy development. Instead, Google designs its Products to prioritize profit.

239.    The result is that the harms and risks of harm that Google's Products pose to students, including M.C., are not outweighed by the benefit of those Products as designed.

**VI.    Google is a state actor as to the Products it operates in public schools.**

240.    Google's Products, policies, and practices described herein are fairly attributable to the government.

241.    Among the customers to which Google markets its Products are public schools and public school districts.

242.    At all relevant times, Plaintiff attended school in a public school district that requires students to use Google's Products.

243.    Google has positioned itself as the *de facto* platform for technology services in education.[37]

244.    These public entities have delegated significant aspects of the public function of administration of public education to Google, including administration and management of student information and pedagogy.

245.    The terms of service governing Google's Products are between Google and schools.

---

[37] *The Implications for EdTech of Google's Market Share in Education*, VISTAPOINT ADVISORS (Jul 29, 2021), https://vistapointadvisors.com/news/implications-edtech-googles-market-share-education.

1    Parents and students are not parties to those contracts.

2    246.    Google's customers are schools, not parents or students.

3    247.    Schools use public funds to procure Google's Products.

4    248.    Students access and use Google's Products because of their legal right and duty to attend

5    school.

6    249.    Far from relinquishing control of their Products once they are sold into schools, Google

7    retains significant and ongoing control over those Products as they are used by students.

8    250.    For students who are required to use Chromebooks at school, like Plaintiff M.C., Google

9    owns and operates the digital environment in which they participate in school.  For example, it is

10   how students access course materials; complete assignments; search for information; store their

11   files; manage their schedules; and communicate with their teachers and peers.

12   251.    While students use Google's Products to participate in school, Google also heavily

13   influences students' online experiences, including the content they may access through algorithmic

14   indexing and content promotion. Google further influences those experiences through other built-

15   in features like Safe Browsing, download blocking, testing and iterating its products, automatic

16   updates, system upgrades, sandboxing, and notification systems. And, of course, it collects vast

17   troves of personal information about those students as they use its Products.

18   252.    Deciding and monitoring what information students have access to and with whom they

19   can communicate at school was traditionally the work of school personnel, as was collecting their

20   personal information. As some experts have observed, "Google's incursion into education

21   threatens and devalues traditional roles of teachers and librarians as sources of wisdom and experts

22   in pedagogy."[38] Google's priorities—productivity, quantification, surveillance, and learning

23   online—puts Google "at the center of one of the great debates that has raged in American

24   education for more than a century: whether the purpose of public schools is to turn out

25   knowledgeable citizens or skilled workers."[39]

26   253.    The manner and extent to which students can access the internet while using Google's

27

---

28   [38] Krutka, "Don't Be Evil," at 426.

[39] *Id.* at 427 (cleaned up).

Products—and attain informational literacy—is thus inseparably controlled by Google and schools.

254.    Google also performs numerous other functions traditionally performed by school personnel, such as distributing lesson materials; grading assignments; monitoring student work; storing student submissions; and managing staff and parent communications.

255.    By facilitating and influencing those core school functions, Google is a state actor as to them.

256.    As many observers have noted, Google has taken over K–12 education, especially since the COVID-19 pandemic shuttered in-person learning in 2020.[40]

257.    Google itself touts the centrality of its role in K–12 education, explaining that school "is a space where technology and pedagogy can work hand in hand to facilitate change – be that by providing teachers with tools to enhance their lessons, creating more fluid learning ecosystems, or transforming classrooms into innovative learning spaces of the future."

258.    Further, state and federal law require that Google obtain parental consent before collecting minors' data. Because its Products all collect user data by design, Google must obtain parental consent before permitting children to use its Products. It does not. Instead, it purports to shift its legal obligation to schools by policy: "Customer [education institution] is responsible for any consents and notices required to permit" Google to collect and use students' personal information. Google's own terms of service thus further highlight the inseparability of Google and the school.

259.    Google's policies also represent that Google acts as a "school official" under FERPA for the purposes of collecting and using student data. As such, Google admits that it acts as a school employee and is subject to the school's control (although it far exceeds any such control). 34 C.F.R. § 99.31(a)(1)(A). By deeming itself a school official under FERPA, Google purports to obviate the need to obtain parental consent before students use its Products, which continuously collect student data, including their personal information. In other words, Google claims it is a "school

---

[40] Singer, "How Google Took Over the Classroom"; Mark West, "An Ed-Tech Tragedy? Educational technologies and school closures in the time of COVID-19," UNESCO (2023), https://teachertaskforce.org/sites/default/files/2023-09/2023_UNESCO_An-ed-tech-tragedy_Educational-technologies-and-school-closures-in-the-time-of-COVID19_EN_.pdf; Gerrit De Vynck, "Google Classroom Users Doubled as Quarantines Spread," *Bloomberg* (April 9, 2020), https://www.bloomberg.com/news/articles/2020-04-09/google-widens-lead-in-education-market-as-students-rush-online.

1    official," in part, to avoid parental involvement, inquiry, and objections.

2    260.    Because it performs functions that were traditionally and exclusively performed by schools,

3    its duties are inextricably entwined with those of schools, and it holds itself out as a school official,

4    Google acts under color of law when providing and administering its Products for student use in

5    the compulsory setting of K–12 public education.

6    **VII.    California law applies to Plaintiffs' claims.**

7    261.    California's substantive laws apply to Plaintiffs because Plaintiffs' injuries emanate from

8    Google's actions in California. Upon information and belief, each actionable decision related to

9    Google's dangerous design, failure to warn, and otherwise unfair and unlawful practices was made

10    from Google's California headquarters by its respective executives and employees in California.

11    262.    Further, Google's own terms of service explicitly require users to "agree that: (i) the Service

12    shall be deemed solely based in California; and (ii) the Service shall be deemed a passive one that

13    does not give rise to personal jurisdiction over Google, either specific or general, in jurisdictions

14    other than California. The Agreement shall be governed by the internal substantive laws of the

15    State of California, without respect to its conflict of laws principles." By choosing California law

16    for the resolution of disputes covered by its Terms of Service, Google concedes that it is

17    appropriate for this Court to apply California law to the instant dispute.

18    263.    Further, California's substantive laws may be constitutionally applied to Plaintiffs' claims

19    under the Due Process Clause, *see* U.S. Const. amend. XIV, § 1, and the Full Faith and Credit

20    Clause, *see* U.S. Const. art. IV, § 1, of the United States' Constitution. California has significant

21    contact, or significant aggregation of contacts, to Plaintiffs' claims, thereby creating state interests

22    that ensure that the choice of California state law is not arbitrary or unfair. Google's decision to

23    reside in California and avail itself of California's laws, and to engage in the challenged conduct

24    from and emanating out of California, renders the application of California law to the claims herein

25    constitutionally permissible.

26    264.    The application of California laws to Plaintiffs is also appropriate under California's choice

27    of law rules because California has significant contacts to Plaintiffs' claims and California has the

28    greatest interest in applying its laws here.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY – DESIGN DEFECT
### (On behalf of Plaintiff M.C.)

265.     Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

266.     At all relevant times, Google designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, licensed, and benefited from its Products, which were used by Plaintiff M.C. in the course of his K–12 education.

267.     Google markets its Products to K–12 schools for use by students.

268.     Google designs its Products to facilitate and encourage broad internet access and use, including by students.

269.     Google also designs its Products to promote content that is harmful to school-aged children, such as pornography, for the purpose of keeping them using its Products so that it may collect their data.

270.     The defects in the design of the Google Products existed prior to the release of these products to the District and the public, and there was no substantial change to any of these Products between the time Google placed them or caused them to be placed in the market and the time they were distributed to the District.

271.     Plaintiff M.C. used these Products in a manner intended by Google, and Google, by the exercise of reasonable care, should have known that Plaintiff M.C. would use these Products without inspection for their dangerousness.

272.     Google's Products are defectively designed and pose a substantial likelihood of harm for the reasons set forth herein, because the Products fail to meet the safety expectations of ordinary consumers (which, here, includes K–12 school personnel, students, and their parents) when used in an intended or reasonably foreseeable manner, and because the Products are dangerous when an ordinary consumer would expect they would be safe.

273.     Google markets, promotes, and advertises its Products for use by K–12 students and as safe for that purpose. School personnel and parents of students do not expect Google's Products to be unsafe when used by students in a compulsory education setting.

274.    Google's Products are defectively designed in that they create an inherent risk of danger to students: specifically, promotion of and access to harmful content and communications. Those harms include but are not limited to promotion of and exposure to age-inappropriate, explicit content, including sexually explicit and ultraviolent content; exposure to predators; exposure to cyberbullying;  and exposure to a digital environment that is generally hostile to healthy development and learning.

275.    The risks of harm inherent in the design of Google's Products significantly outweigh any legitimate benefit of such design for use by K–12 students in the compulsory environment of school.

276.    Google could have utilized cost-effective, reasonably feasible alternative designs to minimize or eliminate the harms described herein.

277.    Alternative designs were and are available that would reduce the likelihood, gravity, and severity of harm that the defective design of those Products poses to children that would have equally or better served the purpose of enhancing students' learning and education.

278.    Plaintiff M.C. used Google's Products as designed and intended by Google.

279.    Plaintiff M.C. used Google's Products in reasonably foreseeable ways.

280.    The physical, emotional, and economic injuries that Plaintiff M.C. suffered were reasonably foreseeable to Google at the time it developed, designed, marketed, and distributed its Products, as Google knows more about its own Products—and the dangers of the internet—than anyone else.

281.    Google's Products and the design of those Products were defective and unreasonably dangerous when they left Google's possession and control. The defects continued to exist through the Products' manufacture and distribution to and use by consumers, including the District and Plaintiff M.C., who used the Products without any substantial change in the Products' condition.

282.    Plaintiff M.C. was injured as a direct and proximate result of Google's defective designs as described herein. The defective design of Google's Products was a substantial factor in causing the harm he suffered.

283.    As a direct and proximate result of Google's Products' defective design, Plaintiff M.C. suffered and continues to suffer serious harm.

284.     As a direct and proximate result of Google's Products' defective design, Plaintiff M.C. has required and will require health-care services and did incur medical, health, incidental, and related expenses, as well as costs relating to his interactions with strangers online and the criminal justice system.

285.     The California Constitution provides that all students have an "inalienable right to attend campuses which are safe, secure, and peaceful." Cal. Const. Art. I § 28(f)(1). By marketing inherently dangerous products into K–12 schools for use by students, Google violated the fundamental right of Plaintiff M.C. to attend a safe school.

286.     The nature of the unlawful acts that created safety concerns for Plaintiff M.C. are not the type of risks that are immediately apparent from using Google's Products.

287.     An officer, director, or managing agent of Google committed an act of oppression, fraud, or malice in designing Google's Products.

288.     Plaintiff M.C. demands judgment against Google for injunctive relief and for compensatory, treble, punitive, and future pain and suffering damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
### STRICT LIABILITY – FAILURE TO WARN
### (On behalf of Plaintiff M.C.)

289.     Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

290.     At all relevant times, Google designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, licensed, and benefited from its Products used by M.C.

291.     Plaintiff M.C. was a foreseeable and intended user of Google's Products.

292.     Google's Products are distributed and sold to schools through retail and/or wholesale channels.

293.     Google designed, marketed, and distributed its Products to Plaintiff M.C.'s schools in a defective and unreasonably dangerous condition.

294.     Google failed to adequately warn that its Products were harmful, specifically, that it

provided students broad, on-demand access to the open internet and promoted harmful content, which was likely to result in the harm suffered by Plaintiff M.C., namely, introduction and continuous exposure to pornographic content.

295.    Google's Products are dangerous to an extent beyond that contemplated by the ordinary user who used those Products—K–12 students in a compulsory school setting—because they permit students to access a vast range of exploitative, predatory, and otherwise age-inappropriate content and communications.

296.    Google knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to students.

297.    Google's Products are defective and unreasonably dangerous because, among other reasons described herein, Google failed to exercise reasonable care to inform consumers—including the District, the Roes, and M.C.—that:

    a.  its paid products were essential for reducing the dangerousness of its Products;

    b.  its Products provided inadequate restrictions to and monitoring of user access and use of the internet;

    c.  its Products are designed to promote and encourage frequent and broad internet access;

    d.  its Products are designed to prioritize search results that maximize user engagement, which is often harmful content;

    e.  its Products are designed for the primary purpose of collecting user data;

    f.  the default settings of its Products and features are not configured and optimized for student safety;

    g.  additional products, services, and activation of features are required to provide any measure of Product safety, including third-party products and services;

    h.  its school-marketed Products are not designed differently than those marketed for general adult consumer use;

    i.  its Products allow students to access inherently dangerous and harmful online products and services, including those that host explicit content, as in the present case; those that are designed to maximize and promote unhealthy engagement; and those that facilitate anonymous communications with unidentified third parties;

    j.  the likelihood and severity of harms is greater for young students;

    k.  use of Google's Products can increase risky, uninhibited, and age-inappropriate behavior in children; and

l.   use of Google's Products desensitizes children from a young age to devalue their safety, privacy, autonomy, and ability to think critically.

298.   Ordinary users would not have recognized the potential risks of Google's Products when used in compulsory K–12 education environments as intended by Google.

299.   Had Plaintiffs received warnings as to the risks of their son using Google's Products, they would have heeded the warning and taken action to protect him.

300.   Google's failure to adequately warn Plaintiffs about the risks of its defective Products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

301.   The physical, emotional, and economic injuries that Plaintiff M.C. suffered were reasonably foreseeable to Google at the time it developed, designed, marketed, and distributed its Products.

302.   The nature of the unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Google's Products.

303.   Google could have, but failed to, warn about the dangers of its Products to protect its own commercial, financial, and legal interests.

304.   An officer, director, or managing agent of Google committed an act of oppression, fraud, or malice in failing to warn about the dangers of Google's Products.

305.   Plaintiff M.C. demands judgment against Google for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
**NEGLIGENCE – DESIGN**
**(On behalf of Plaintiff M.C.)**

306.   Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

307.   At all relevant times, Google designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, licensed, and benefited from its Products used by M.C.

308.   Google knew or, by the exercise of reasonable care, should have known, that its Products were dangerous, harmful, and injurious when used by K–12 students in a reasonably foreseeable manner.

309.    Google knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to K–12 students. These risks were known and knowable to Google at all relevant times.

310.    Google knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as the District and Plaintiffs would not have realized the risks and dangers Google's Products posed to students like M.C. Those risks include promotion of and exposure to age-inappropriate, explicit content; exposure to predators through messaging platforms; exposure to online products designed to addict users; and exposure to a digital environment that is generally hostile to healthy development and learning.

311.    Google owed a duty to all reasonably foreseeable users to design safe products, especially K–12 student users.

312.    Google owed a heightened duty of care to K–12 students using its Products because of their inexperience and because their brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding safe and healthy internet usage.

313.    Plaintiff M.C. was a foreseeable user of Google's Products.

314.    Google knew and intended that students such as Plaintiff M.C. would use its Products.

315.    Google breached its duty in designing its Products.

316.    Google breached its duty by failing to use reasonable care in the design of its Products by negligently designing them in a manner dangerous to young students, who are particularly unable to appreciate the risks posed by Google's Products.

317.    Google breached its duty by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including, but not limited to, those described above and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the dangerousness of Google's Products were technologically feasible, would not have unduly compromised the educational purpose for which Google marketed its products, and would have reduced or eliminated the gravity and severity of danger that its Products posed to Plaintiff M.C.

318.    A reasonable company under the same or similar circumstances as Google would have designed a safer product.

319.    At all relevant times, Plaintiff M.C. used Google's Products in the manner in which Google intended them to be used.

320.    As a direct and proximate result of each of Google's breaches, Plaintiff M.C. was harmed. Google's design of its Products was a substantial factor in causing Plaintiff M.C.'s harms.

321.    The nature of the unlawful acts that created safety concerns for Plaintiff M.C. are not the type of risks that are immediately apparent from using Google's Products.

322.    An officer, director, or managing agent of Google committed an act of oppression, fraud, or malice in designing Google's Products.

323.    Plaintiff M.C. demands judgment against Google for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE – FAILURE TO WARN**
**(On behalf of Plaintiff M.C.)**

324.    Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325.    At all relevant times, Google designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, licensed, and benefited from its Products used by M.C.

326.    Plaintiff M.C. was a foreseeable and intended user of Google's Products.

327.    Google knew, or by the exercise of reasonable care, should have known, that use of its Products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by young children in an education setting.

328.    Google knew, or by the exercise of reasonable care, should have known that ordinary consumers, including K–12 students such as Plaintiff M.C., would not have realized the potential risks and dangers of Google's Products, such as promotion of and exposure to age-inappropriate, explicit content; exposure to predators through messaging platforms; exposure to online products designed to addict users; and exposure to a digital environment that is generally unconducive to healthy development and learning.

329.    Had Plaintiffs John Roe and Jane Roe received adequate warnings about the risks that Google's products posed to Plaintiff M.C. they would have heeded such warnings and taken action to protect him.

330.    Google knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to K–12 students. These risks were known and knowable at the time of development, design, marketing, promotion, advertising and distribution of those Products to the District.

331.    Google owed a duty to all reasonably foreseeable users, including but not limited to students, to provide adequate warnings about the risk of using Google's Products that were known to Google, or that Google should have known through the exercise of reasonable care.

332.    Google owed a heightened duty of care to young users to warn their parents about its Products' risks because children lack the experience and cognitive development to make responsible decisions regarding internet usage.

333.    Google failed to warn District personnel, M.C., and the Roes about the dangerousness of its Products.

334.    Google failed to alert District personnel and the Roes when M.C. accessed harmful, age-inappropriate content.

335.    Google breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiffs or District officials, as detailed herein.

336.    As a direct and proximate result of each of Google's breach, Plaintiff M.C. was harmed. Google's failure to warn of its Products' dangers was a substantial factor in causing M.C.'s harms.

337.    The nature of the unlawful acts that created safety concerns for Plaintiff M.C. are not the type of risks that are immediately apparent from using Google's Products.

338.    An officer, director, or managing agent of Google committed an act of oppression, fraud, or malice in failing to warn about the dangers of Google's Products.

339.    Plaintiff M.C. demands judgment against Google for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
NEGLIGENCE
**(On behalf of Plaintiff M.C.)**

340.    Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341.    At all relevant times, Google designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, licensed, and benefited from its Products used by Plaintiff M.C.

342.    Google owed Plaintiff M.C. a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its Products not to create an unreasonable risk of harm from and in the use of its products; to protect Plaintiff M.C. from unreasonable risk of injury from and in the use of its products; and not to invite, encourage, or facilitate students, such as Plaintiff M.C., to foreseeably engage in dangerous or risky behavior through, on, or as a reasonably foreseeable result of using its Products.

343.    Plaintiff M.C. was a foreseeable and intended user of Google's Products.

344.    Google knew and intended that K–12 students such as Plaintiff M.C. would use its Products.

345.    Google invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff's use of Google's Products.

346.    Google knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its Products (as designed, developed, set up, managed, maintained, supervised, and operated by Google) was dangerous, harmful, and injurious when used by students such as Plaintiff M.C. in a reasonably foreseeable manner.

347.    Google knew or, by the exercise of reasonable care, should have known that its Products posed unreasonable risks of harm to students such as Plaintiff M.C., which risks were known and knowable to Google at all relevant times.

348.    Google knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its Products, such as Plaintiff M.C., would not have realized the potential risks and dangers of using its Products.

349.    Google's conduct was closely connected to Plaintiff M.C.'s injuries, which were highly

1  certain to occur with broad access to the internet and algorithmically promoted pornographic

2  content.

3  350.    Google could have prevented Plaintiff's injuries by prioritizing safety in designing its

4  Products without jeopardizing any purported educational benefits to him and other students.

5  351.    Imposing a duty on Google would benefit the community at large.

6  352.    Imposing a duty on Google would not burden the company because it has the technological

7  and financial means to avoid posing serious risks of harm to students.

8  353.    Google owes a heightened duty of care to minors who use its Products because they lack

9  the experience, cognitive development, and emotional maturity of adults, leaving them more

10  vulnerable to the many harmful aspects of the open internet, to which Google's Products provide

11  and promote unrestricted access.

12  354.    Google owes a particularly heightened duty of care to young users due to the recognized

13  safety risks posed to such users from interactive digital platforms, especially those whose terms of

14  service state they are not intended for users under 13, such as websites that host pornographic

15  content.

16  355.    Google breached its duty of care owed to Plaintiff through its affirmative malfeasance,

17  actions, business decisions, and policies in the development, setup, management, maintenance,

18  operation, marketing, advertising, promotion, supervision, and control of its Products. Those

19  breaches include:

20      a.   designing its Products to permit and promote broad internet access by students;

21      b.   designing its Products to recommend harmful content;

22      c.   designing its Products to maximize user-data collection;

23      d.   failing to design its Products to optimize for student safety;

24      e.   failing to design its Products to be safe for use by students out of the box;

25      f.   failing to design its Products to be made safe by third parties, including school
26          personnel and parents;

27      g.   designing its Products in a manner that prevents third parties, including school
          administrators or parents, from easily and effectively configuring it for safe use;
28

        h.   failing to include safety features and products in all of its Products by default;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     i.    failing to include or configure safety features and products in all of its Products by default;

     j.    failing to implement effective parent access, monitoring, and controls despite knowing that its Products would be used in the home environment; and

     k.    designing its Products to exclude parents from participation in, knowledge of, and control over their child's use of its Products.

356.    A reasonable company under the same or similar circumstances as Google would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of young students like Plaintiff M.C.

357.    At all relevant times, Plaintiff M.C. used one or more of Google's Products in the manner in which Google intended them to be used.

358.    As a direct and proximate result of Google's breach of one or more of its duties, Plaintiff M.C. was harmed.

359.    Google's breach of one or more of its duties was a substantial factor in causing harms and injuries to Plaintiff M.C.

360.    The nature of the unlawful acts that created safety concerns for Plaintiff M.C. are not the type of risks that are immediately apparent from using Google's Products.

361.    An officer, director, or managing agent of Google committed an act of oppression, fraud, or malice in designing and failing to warn about the dangers of Google's Products.

362.    Plaintiffs demand judgment against Google for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT**
**(On behalf of Plaintiffs John Roe and Jane Roe)**

363.    Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

364.    To state a claim under 42 United States Code section 1983, a plaintiff must allege that the defendant, acting under color of law, deprived the plaintiff of a federally protected right.

365.    The ultimate issue in determining whether a person is subject to suit under section 1983 is the same question posed in cases arising under the Fourteenth Amendment, which is whether the

1    alleged infringement of federal rights is fairly attributable to the government.

2    366.    Google was, at all relevant times herein, acting under the color of state law.

3    367.    The allegations set out herein are sufficient to permit a reasonable inference that Google's

4    conduct, and its attendant violation of parents' federal rights, is fairly attributable to the

5    government.

6    368.    Google has been authorized by government entities to perform functions that are

7    traditionally and exclusively a public function performed by the government, namely, collection

8    and maintenance of student information and provision of administrative and pedagogical tools and

9    services.

10   369.    Google is jointly engaged with state officials in the violative conduct and, as such, is acting

11   under color of law.

12   370.    The conduct by Google alleged herein is so entwined with the District's policies that it may

13   fairly be treated as that of the District itself.

14   371.    Google seeks to fully align itself with public schools, including the District, for the purposes

15   of administering its Products for use by students.

16   372.    Google represents to the public that it is a "school official" under federal law in order to

17   obtain and use student data without obtaining parental consent. Because Google's Products

18   continuously collect student data, Google does not notify parents of the sweeping data practices

19   central to Google's business or obtain consent from parents before their children use its Products.

20   373.    As a state actor providing students access to its Products, Google owes a duty of care to

21   those students and their parents.

22   374.    Google engages in the conduct described herein with the authority of the District and in

23   excess of that authority.

24   375.    Google's Products, policies, and practices violate the constitutional rights of Plaintiffs John

25   Roe and Jane Roe, including their rights under the Fourteenth Amendment of the U.S.

26   Constitution.

27   376.    The Fourteenth Amendment protects the fundamental right of parents to make decisions

28   concerning the care, custody, and control of their children.

377.    The Fourteenth Amendment also guarantees the right of parents to direct the upbringing and education of children under their control.

378.    Google's Products, policies, and practices denied Plaintiffs John Roe and Jane Roe knowledge of and control over and M.C.'s use of Google's Products, which prevented them from protecting M.C. from danger.

379.    Google's Products, policies, and practices enabled and encouraged M.C. to access objectively harmful and age-inappropriate content that Plaintiffs John Roe and Jane Roe would have not permitted M.C. to access and that the school had not authorized.

380.    Google's Products, policies, and practices prevented Plaintiffs John Roe and Jane Roe from providing M.C. the care he required after he was subjected to harmful content using Google's Products and maintaining the environment necessary to keep him safe from harm.

381.    Google's actions have intruded upon the constitutional rights of Plaintiffs John Roe and Jane Roe far beyond what is reasonably necessary to provide public education services, especially given that a safer and equally (or more) effective design was feasible, as described herein.

382.    Google's Products and policies are not narrowly designed and tailored to serve a compelling state interest, especially given that the schools had not authorized M.C.'s access to harmful, sexually explicit content. Indeed, Google designed its Products in a manner that promoted harmful content and prevent parental supervision and control.

383.    Google thus violated the fundamental right of Plaintiffs John Roe and Jane Roe to raise and nurture M.C.

384.    Plaintiffs John Roe and Jane Roe demand judgment against Google for injunctive and monetary relief, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**Cal. Bus. & Prof. Code § 17200 *et seq.* – California's Unfair Competition Law ("UCL")**
**(On behalf of all Plaintiffs)**

385.    Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

386.    Plaintiffs lack an adequate remedy at law.

387.    In addition or as an alternative to legal remedies sought herein, Plaintiffs seek equitable relief to the extent that legal remedies are inadequate.

388.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Google has violated the UCL.

389.    A plaintiff may pursue a claim under the UCL through any or all of three prongs: the unlawful prong, the unfair prong, or the fraudulent prong.

390.    Google's conduct violated the spirit and letter of the laws as alleged herein, which protect student safety and parental caretaking interests.

391.    Google's unfair acts and practices include its violation of Plaintiffs' safety, privacy, economic, and parenting rights protected by federal and state law.

392.    To establish liability under the "unfair" prong, Plaintiffs need not establish that these laws were actually violated, although the allegations herein establish that they were. The foregoing allegations are tethered to underlying constitutional, statutory, or common-law provisions; describe practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; and show that the negative impact of Google's practices on school-aged children and their parents far outweighs the reasons, justifications, and motives of Google.

393.    The foregoing allegations also establish liability under the "unlawful" prong, as they show that Google violated numerous state and federal laws protecting individual safety, autonomy, and parental caretaking.

394.    Plaintiffs have suffered injury-in-fact, including physical and mental harm, the loss of money or property, and Plaintiff parents' ability to keep their children safe as a result of Google's unfair and unlawful practices, as described herein.

395.    Google reaped unjust profits and revenues in violation of the UCL. This includes its profits and revenues from its sale and licensing of its Products, which Google designs in a manner that is unsafe for use by children in the compulsory-education setting. Google does not warn of the dangers its Products pose to children and in fact falsely and misleadingly markets them as safe. Plaintiffs seek restitution and disgorgement of these unjust profits and revenues.

## RELIEF REQUESTED

396.     Plaintiffs respectfully request that the Court enter judgment in their favor and against

Google as follows:

     a.  An award of damages, including actual, compensatory, general, special, incidental, consequential, punitive, and future pain and suffering damages, in an amount to be determined at trial;

     b.  Injunctive, declaratory, and other equitable relief as is appropriate;

     c.  Pre- and post-judgment interest to the extent provided by law;

     d.  Attorneys' fees to the extent provided by law;

     e.  Costs to the extent provided by law; and

     f.  Such other relief the Court deems just and proper.

## JURY TRIAL DEMAND

397.     Plaintiffs demand a jury trial for all claims so triable.

Dated: October 17, 2025

Respectfully submitted,

By: */s/ Rebecca A Peterson*

Rebecca A. Peterson (241858)
RPeterson@4-justice.com
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
Tel.: (612) 778-9595
Fax: (888) 421-4173
**GEORGE FELDMAN MCDONALD, PLLC**

Julie U. Liddell (*pro hac vice* forthcoming)
julie.liddell@edtech.law
W. Andrew Liddell (*pro hac vice* forthcoming)
andrew.liddell@edtech.law
904 Rio Grande Street, Suite 100
Austin, TX 78701
Tel: +1 737 351 5855
**EDTECH LAW CENTER PLLC**

Will Horowitz (Cal. Bar No. 323961)
will@qureshi.law
Omar G. Qureshi (Cal. Bar No. 323493)
omar@qureshi.law
700 Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (213) 600-6096
Fax: (213) 277-8989
**QURESHI LAW PC**

David George (*pro hac vice* forthcoming)
DGeorge@4-Justice.com
9897 Lake Worth Road, Suite #302

Lake Worth, FL 33467
Tel.: (561) 232-6002
Fax: (888) 421-4173

Lori G. Feldman (*pro hac vice* forthcoming)
LFeldman@4-justice.com
Michael Liskow (SBN 243899)
MLiskow@4-Justice.com
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel.: (718) 878-6433
Fax: (888) 421-4173
**GEORGE FELDMAN MCDONALD PLLC**

Ryan J. Ellersick (Cal Bar No. 357560)
6420 Wilshire Blvd, Suite 1080
Los Angeles, CA 90048
Tel: (310) 752-9385
Fax: (877) 500-8781
**ZIMMERMAN REED LLP**

*Attorneys for Plaintiffs*