**Pages 1 - 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

JOHN ROE, et al.,

Plaintiffs,

VS.

GOOGLE, LLC,

Defendant.

**NO. 4:25-CV-08927-AMO**

Oakland, California
Thursday, July 2, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

EDTECH LAW CENTER, PLLC
904 Rio Grande Street, Suite 100
Austin, TX 78701
**BY: JULIE U. LIDDELL, ATTORNEY AT LAW**

HECHT PARTNERS, LLP
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
**BY: CATHERINE A. PETERSON, ATTORNEY AT LAW**

For Defendant:

Arnold & Porter Kaye Scholer, LLP
Four Embarcadero Center, 14th Floor
San Francisco, CA 94111
**BY: SUNITA BALI, ATTORNEY AT LAW**

PERKINS COIE
505 Howard Street
San Francisco, CA 94105
**BY: JAMESON ULLMAN, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**Thursday - July 2, 2026** **1:58 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Now calling civil matter 25-8927, Roe, et al. versus Google, LLC. Counsel, please approach the lectern and state your appearances beginning with plaintiffs' counsel.

**MS. LIDDELL:** Good afternoon, Your Honor. Julie Liddell for plaintiffs, with the EdTech Law Center.

**THE COURT:** Good afternoon.

**MS. PETERSON:** Good afternoon, Your Honor. Catherine Peterson, Hecht Partners, LLP, representing plaintiffs for the initial case management conference.

**THE COURT:** Thank you. Good afternoon.

**MS. BALI:** Good afternoon, Your Honor. Sunita Bali for defendant Google, along with my colleague, Jameson Ullman.

**THE COURT:** Good afternoon to you both.

Folks, as it might be evident from my June 9th text order, I'm inclined to grant the motion to dismiss, so I want to start today by asking a number of questions of plaintiffs' counsel. Thereafter, I'll give plaintiffs a few minutes to address anything further that they wish, and after that I'll give defendants an opportunity before we -- before we end for the day.

So I want to start -- and I leave it to plaintiffs. You

all can, whoever needs to can come to the lecturn, but I want to start by discussing Section 230. My sense is that I don't -- I don't have any questions for you all initially about the first prong of the test, but I want to discuss the second and the third prongs with you, beginning with whether the complaint seeks to hold Google liable as a publisher.

**MS. LIDDELL:** Yes, Your Honor.

**THE COURT:** That's not my question. Sorry, I'll get there.

But here's maybe where I'm trying to take you, right. The complaint alleges that MC was injured by exposure to Internet pornography at a young age which led to a number of unsafe interactions with others online, among other problems. So I'm trying to understand if that's the injury for which you're seeking to hold Google liable, and if you aren't actually arguing that Google somehow suppressed that content.

**MS. LIDDELL:** You bet.

And so we are not trying to hold Google liable as a publisher. We are trying to hold Google liable as a manufacturer and designer of a product that it sold into public K through 12 schools.

The ... to your specific point about the third-party content and the fact that it was the content that caused the harm, if the test was what tech companies for 20 years now have been arguing for, which is say but-for test of liability that

essentially says if third-party content or communications are some link in the causal chain, any part of that link, that 230 would apply, but the Ninth Circuit and I think every district court below it has taken care over the last 20 years to say it is not a but-for test. It is not enough to say third-party content was involved for 230 to apply. They've made clear that that would stretch 230 far beyond what the language says and what was intended.

And so here, yes, we of course admit that it was the third-party content that caused the harm, but it's the more specific question of not only was -- did the harm -- is the duty that's underlying the claims, does that have to be a publishing duty, but also specifically the fix has to be monitoring, a monitoring or moderation piece of publishing. And here we say that Google doesn't check either one of those boxes; that, again, the *Bride* case that you wanted us to focus on does a great job of setting out the standard of saying step one is determine the -- I don't want to get it wrong. It's, we must first examine the right from which the duty springs. Does it stem from the platform status as a publisher, in which case it's barred by 230, or does it spring from some other obligation, such as a promise or contract. If it requires that *Yolo*, the platform in this case or the extension in this case, moderate content -- I'm sorry.

Second, we ask what this duty requires the defendant to

do. If it requires that *Yolo* moderate content to fulfill its duty, then 230 immunity attaches. And so we say before we even get to monitoring we stop at step one, which is does this arise from a publishing duty, and we say it doesn't. This case is more like the *Lemmon* case that Google cites in its reply brief that made the distinction between a publishing duty and a duty that arises from product design, of safe design. And in that case the platform issue was Snap, that they were looking specifically at a feature of that platform that, it was called the speed filter, and it allowed users to basically take a realtime shot of their speed and post it to the platform.

And they said that was -- the Court said, the Ninth Circuit said that was sufficiently separate from any publishing duty and certainly any monitoring duty to avoid 230. And we say this case is even further away from 230 than *Lemmon* was, because what we're talking about here is not a single platform, but school K through 12 Chromebooks, school-issued computers. And so from that, I think it's important to note that just the difference between the product at issue here and the platforms at issue in all the other 230 cases.

All the 230 cases dealt by and large with, they were platforms, many of them, if not most of them, social media platforms, but all of them were platforms, the whole point of which was connecting third parties, was allowing users to go and access third-party content and communications.

**THE COURT:** But stay with the *Yolo* case for a moment, because to the extent that the harm that was asserted in *Yolo* was about the bullying being done by someone else. Again, that seems very similar to the harm that you all are asserting, as well. So in a moment I'll ask you some more questions about the way that you're pleading the products, because in this moment you're talking to me about the Chromebook, but that's not the only product you're raising, and I think that has some problems for you. But tell me why -- I guess I found the *Yolo* case analogous in terms of what you're putting forth as harms.

**MS. LIDDELL:** So I think the biggest difference is that, again, the *Yolo* case dealt with not even just a platform, but an extension to the Snap platform that allowed users, a Snap to post anonymously. So essentially anonymously, anonymous posting, anonymity was the point of that product. And so when the user plaintiff sued and targeted as the defect the anonymity, the Court, I mean, basically said, well, but that is the point, and anonymity specifically goes to publishing in that it determines who publishes, who uploads content, how they do it. That is very clearly a publishing function.

And whereas here, again, we're not talking about an extension or even a single platform. We're talking about school-issued computers, which are far more complex than any single platform or individual extension. And that's relevant

because, again, that puts us much more firmly in the product design duty than in the publishing duty because, again, with school-issued Chromebooks the point is unlike --

**THE COURT:** I'm going to pause you for a moment, because you keep focusing on the Chromebooks, but that's not the only product you have -- in fact, you keep -- throughout your complaint the products are lumped together. And so to the extent -- so you can keep talking at me about the Chromebooks, but the problem with that is that's not the way your complaint is alleged. So talk to me about how these cases that you think required your complaint standing, how does that work with it in light of the other products that you have alleged, and that you're bundling them? You have bundled them in your complaint.

**MS. LIDDELL:** Whether, that's right, because they're bundled in the product. And I'm using Chromebook as a shorthand to refer to all of these sort of subproducts, which in tech speak it's actually they're not considered individual products even though they may be sold individually in other contexts. Here they're considered layers of the tech stack. And so when you're talking about a Chromebook you're not talking about an individual component. You're not talking about just the physical hardware. It is the physical hardware, but it's also the operating system, it's also the browser, it's also the Google-owned K through 12 apps that come pre-installed. It's also Google Search. It's also the admin.

console. It's also Google's algorithms that are baked into the infrastructure of the OS and the browser.

And so it is -- I mean, and in that sense we are completely far afield from any of the 230 cases in our jurisprudence. None of -- no case has considered a product as complex and layered as this one, and we think, again, that's why it's just, it's, the 230 cases are simply inapplicable, because again, the publishing function was really ancillary to, and I would -- I mean, we argue, we allege that contrary to what Google was selling, Google didn't sell schools, here's Google Search, a portal to the Internet, our commercial algorithm, you know, take care. They sold them a Chromebook. That's perfect for K through 12, but they don't even mention anywhere in their marketing tools online or Internet. It's all about built-in tools, about facilitating class functions, pedagogy and administrative functions.

And so the focus obviously is on the Google apps, which is a suite of applications, school -- the applications that include utility tools like word processing, Docs, Slides, Sheets, file management, like Google Drive, Google Classroom, which is the hub, right? You know, that's the learning management system that schools use, that teachers use to provide assignments. Schools submit their assignments through Classroom. The teacher gives grades. It's where they do communications. It really is kind of the digital hub of

school.

And so all of that is completely separate and apart from searching the Internet and third-party content. And so our position is this is unlike the other cases where there was no question that publishing was at least nominally at issue. Whether that was the duty that was underlying the claim, there wasn't an issue, that the platform itself the point was publishing. And here our point is we don't even think Google should even be in the business of publishing in K through 12. We think that it -- and based on what Google has said, that it had the obligation of building computers that it knew, it targeted this captive audience of minors that it knew, in the context of compulsory education, that it knew would have to use its products as part of their education, and that from that the special relationship formed that's not at issue in any of the other cases.

So you have, number one, the fact that it was selling a physical product into a school, a multi -- again, a fully integrated hardware/software product with all of these different layers that makes it much more akin to a product defect case. And then number two, the fact of who it sold it to and what it said, what it didn't say. And from all of those different duties arise that have nothing to do with publishing. I mean, it's our position that if you're going to market a computer as safe for kids as young as five, it shouldn't have

Internet access at all. There should never be a scenario in which a five-year-old has access to unvetted third-party content and communications. If this wasn't digital, if we made this physical, if we had an analog example, we would have no trouble saying that no publisher gets to come into a school and say, I have the right to publish what I see fit. I have full editorial freedom within the context of K through 12 education.

And so as soon as Google stepped into that role and targeted -- and again, it would be different if schools had just gone to BestBuy, grabbed Chromebooks off the shelf and gave them to their kids. It's not what happened. Google targeted this market, targeted children and said, here, we've got computers that are great for school, they're great for learning, they're safe, they're perfect for kids of all ages. Nowhere did they say, oh, and, oh, yeah, it's also a portal to all things on the Internet, that unless you do anything to it is going to give kids unrestricted access through many access points to all manner of third-party content and communications.

**THE COURT:** So Ms. Liddell, let me see if I'm following you.

**MS. LIDDELL:** Uh-huh.

**THE COURT:** Your position is that you are not suing Google as a publisher, but instead for having designed this product that allows someone to access things published by others?

**MS. LIDDELL:** Well, not just someone, children in the captive compulsory context of K through 12 education, which is a hugely distinguishing feature. There are no cases, no 230 cases that have that critical fact, and it is a critical fact.

**THE COURT:** Which prong of 230 does that factor into?

**MS. LIDDELL:** Prong two, determining what the duty is. And here the duty is not publishing. Here the duty is designing computers that are safe for children as young as five to do schoolwork.

**THE COURT:** Let me talk to you about prong three for a minute. I want to understand your position on whether Google material' -- I guess I want you to talk to me about how *Doe v. Meta*, the other case that I asked you all to come prepared to talk with me about, how this case is different from *Doe v. Meta* with regard to Google's contribution to the -- or a material contribution to the content.

**MS. LIDDELL:** Sure. Uh-huh, yes.

And this is admittedly a very complex area of the law very quickly evolving. And so I think the Ninth Circuit took the position of saying, of acknowledging that and saying this is in part because algorithms are just evolving faster than we can -- than the law can possibly keep up. So they made the point of saying this is limited to the Facebook algorithms of 2009, which, at the time it determined were neutral tools, that it -- they were driven by user query, that they used very -- that it

much more functioned like a passive conduit that's trying to deliver results that are relevant to the stated user intent, and they specifically made a point of saying, we're not weighing in on algorithms that are, you know, 10 years later, 15 years later that are far more complex.

And so our position is these aren't Goog' -- this isn't Facebook algorithms. This isn't even Google algorithms from 2009. These are Google algorithms from the 2020s, when we know that they are not neutral. We know they do not act as a passive conduit. We know that they act instead to take user inquiries, surface what are at least tangentially-related content, but then it ranks them and delivers them in a way that is specific to that user. And again, it's not as to what the user wants based on their stated preference, you know, as indicated in any kind of search query, but it's to maximize that user's engagement by taking a profile that Google builds the whole time that kids, that users are in their ecosystem, and using it to exploit their vulnerabilities to keep them online longer.

**THE COURT:** Tell me where the, those distinctions you're drawing about the algorithm from, the Meta algorithms from 2009 and the algorithms being used by Google, where are those in your complaint?

**MS. LIDDELL:** Yes, we are ... oh, here we go.

So we have that it's not a passive conduit, that it's

ranking not on relevance. At paragraphs -- broadly it's paragraphs 73 through 85. That it's using vast troves of student data to build a profile which we say was ill-gotten, that it needed to get parental consent before harvesting all of this information, and that's specifically at 88 through 97. And that it's using this profile to exploit vulnerabilities to maximize engagement, and that's several places. It's 11, 67 through 80, 194 through '97.

And all -- and then I will add to that the fact that we have this -- what happened here, what we alleged happen here was consistent with those -- with what we understand, how we understand these new engagement optimizing algorithms to work, which is this little boy didn't go onto Google and say, show me pornography. He went onto Google and said, I want information about Pokémon. I think there were a couple of characters that he was specifically interested in, and that the algorithm essentially started with information that was, again, ostensibly related to that. It was looking at, you know, like romantic relationships between these characters. And then the more that he continued clicking on things and searching, it would continue to recommend increasingly sexualized content.

And our position is that that is very much how its algorithms are designed to work. Not that Google had engineers that were saying if it's a kid promote porn, it's just the natural result is if you have engagement, if you design

algorithms to be optimized for engagement over relevance, if it's essentially think of the difference as serving and honoring user intent versus subverting and hijacking that intent. That that's when it starts to take on the character that content that Google has developed. It's no longer just a neutral tool for delivering other people's content. Google is now using this content essentially as bait. It's weaponizing this content to keep the user in the ecosystem and clicking and clicking, and it starts to see that the more that he clicks and is more increasingly interested in this sexualized content, it will feed him more and more of that.

And it's not just more of, you know, romantic relationships between Pokémon characters, but it's anime pornography, and then eventually it's actual pornography, pictures and then videos. And so again, there's no one behind the curtain, you know, maniacally doing, this. It's just how the algorithms are designed. And our position is that, well, number one, there should be no opaque proprietary algorithms serving young children content in the first place, again, in the context of using a K through 12 school-issued computer, but that even if you accept that some publishing can happen in this context, that it needs to be -- it needs to be transparent, and it certainly cannot be that it's engagement optimized algorithms.

And again, this -- I don't mean to get super into the

weeds here, but I do think that we have alleged enough to show this isn't like the algorithms that were at issue in *Meta*. They aren't even like the algorithms at issue in *Dyroff*, the 2019 Ninth Circuit case that *Doe* largely relied on. *Dyroff* made clear -- and that was a case where the poor gentleman made an account on, I think it was -- I can't remember which platform it was. I think it was something called the Experience Project.

But the point was he went on to look for heroin. And so he went on, I can't remember what the exact search was, but it wasn't as though, you know, he went on and was recommended a gardening group and then, you know, asked where can I score sunflower seeds, and then, you know, it's he went on looking for where can I score heroin. And so that was critical to that case, that it wasn't the case of he goes to, again, a gardening group, asks where can I score sunflower seized, and then the algorithm pushes him to poppy seeds and then opium and heroin. I think that would be a very different case, but they highlighted the importance of the neutrality as evidence by the fact that the results that were produced were very much related to the user's stated preference.

**THE COURT:** Let's turn to your 1983 claim for a moment here. I want to talk with you a little bit about the government nexus and joint action tests for determining state action. I read *Caviness* as requiring me to look at the conduct

complained of and consider whether the government was so intertwined in that conduct that it would make sense to hold Google liable as a state actor.

Is the contact complained of here Google's design of the products?

**MS. LIDDELL:** It is its design and control over, continued control over. Again, this -- we're not suing Google as the maker of a physical textbook or pencils. They're the owner and operator of this digital ecosystem where kids spend most of their day at school.

**THE COURT:** What involvement did the school district have in that?

**MS. LIDDELL:** The school districts purchased the Chromebooks. They designed the contract, distributed them to children, and they built their curriculum around it.

**THE COURT:** So to the extent that I'm supposed to be looking for joint action, your contention is that because the school district purchased these things and put them in the hands of the students, that's sufficient joint action to extend -- for Google to be acting -- for Google to be considered a state actor under 1983?

**MS. LIDDELL:** I think, yes. And specifically it's the creation of a digital environment, again, that while the school does exercise some modicum of control over, our position is that in that environment Google has far more control over

that environment than schools do, and certainly than parents do, who are completely excluded, and intentionally excluded from that environment. And so in that sense it's fair to say that Google and the school have assumed joint custodial control over students while they use these products, while they're in this ecosystem, this vast ecosystem that apparently is unlimited and includes all manner of content and communications on the Internet.

**THE COURT:** Do you raise allegations about the school's conduct in developing these products? And I hear you saying that they maintain some control after they've been put in the hands of students, but do you -- there's a degree to which you are also seeking to hold Google liable. We started by you telling me it's about the design of these products. What role does the school district play in the design of these products?

**MS. LIDDELL:** So the school is not involved in the design, and I don't read the case law as requiring that level of involvement. For design defect the state does not have to be actively involved in the design.

When you think about the cases that we cited, I think it's *Brannum*. That was out of the Seventh Circuit, I believe. There the case was cameras, security cameras; that the school hired this company to place security cameras across the campus. And the school and the company jointly made decisions about

where to put the cameras, and it turns out one of the cameras was in a locker room, et cetera.

And so the -- it didn't turn on whether or not the school helped design the cameras.

**THE COURT:** But they also weren't asserting design problems with the cameras put into -- you are asserting design -- we started with you telling me the duty -- right, Google's not a publisher. The problem is the design of their product. So if the 1983 claim as against Google as a private -- weave these together for me, because that's where I'm having some cognitive dissidence here.

**MS. LIDDELL:** Sure.

So I think it is coherent to say both that Google, and Google alone, designed Chromebooks, every aspect of that layer. It then marketed those products, that product, to school, and school purchased that product, understanding that it would be used, again, actively, continually, compulsively or compulsory and compulsively by students. And so, and then the school does exercise some modicum of control via this admin. console. Which, we of course say it's defective for a host of reasons, but the fact is that it is school exerting some level of control in conjunction with Google managing this digital environment.

Now, of course we say the defective design took a lot of that control away from schools, right? The admin. console was

not adequately designed. The browser, the OS itself was defective in that a student could log out of an unmanaged account and log back in with one that wasn't managed, which means in that scenario the child was completely outside of the school's protection and custody and completely within Google's custody. And again, that has nothing to do with publishing and everything to do with design defects.

**THE COURT:** I have one, maybe two more questions for you related to your UCL claim.

On the UCL claim you assert violations of both the unlawful and unfair prongs. Could you tell me again what the predicate legal violations are that you're alleging to support the unlawful prong?

**MS. LIDDELL:** Yes, Your Honor.

So you asked about unfair, unlawful?

**THE COURT:** I'm asking -- well, I see you asserting both of them, and I want you to help me better understand what you are -- what the predicate legal violation is for the unlawful prong. And mind you, I will share that I'm trying to understand, because I don't think it's addressed by either side, whether you're basing that on a FERPA violation.

**MS. LIDDELL:** Right.

**THE COURT:** So you can tell me "no," which is why I just want you to tell me what --

**MS. LIDDELL:** Sure, sure. You bet.

And so for the unlawful prong we allege the product liability claims and negligence claims, as well, of course, as the Fourteenth Amendment claim and the statutory implied warranty claim.

And then for the unfair prong, of course, that can overlap with the unlawful prong, but we would add to that the fact -- again, it's kind of these facts around the compulsory nature of the environment and the use of this product. The fact that in order to get into schools, and specifically to avoid parental consent or even knowledge about these products, Google holds itself out as a school official, suggesting -- which would require, under FERPA, that it's under the total and complete control of schools with respect to student data, and we allege it is absolutely -- is anything but under the school's control for that purpose.

And so it is unfair that it held itself out under federal law as one thing in order to get into schools, and then once it's there it acts very much outside of the control of schools.

**THE COURT:** But if I'm following -- and if I'm following you, FERPA's for unfair, not for unlawful?

**MS. LIDDELL:** Correct, yes.

**THE COURT:** Okay. Counsel, we walked through my questions. As promised, I want to give you a chance to hit on anything that I didn't ask you about, but that you think I should have asked you about.

**MS. LIDDELL:** Okay. Thank you.

So I just, again, want to reiterate the point that in all of these cases the defects pertain to not only a single platform, but individual features, and in most of these cases there's maybe one or two features, right? It's the anonymity extension. It's the speed filter. It's the drop-down box that prompts discriminatory information of the FHA.

Here we have alleged literally two dozen different defects at every layer of the stack, what we call in the complaint "products" but more technically are referred to as just layers of this Chromebook stack. And so I won't go through all of them, but I just want to say at a high level it's the unrestricted access that these computers give children by default. It creates numerous, and we say gratuitous access points to the Internet, many of which are hidden, that you wouldn't know about unless you're an enterprising child Googling how do I get around my school's networking filter. It's the opacity. Beyond just the inner workings of the algorithms, it's the opacity. It's the fact that schools have no transparency over how that content is being delivered, let alone what that content is.

It's the fact that it's -- and then again, getting to the merits, the inner workings of the algorithms, that it's using data contained without consent to build profiles in order to maximize engagement by exploiting user, student

vulnerabilities, and that it's the inadequacy of the administrative tools. Which, the recent social media cases have made clear those are not publishings features, those do go to design defects. And then completely nonexistent parental tools, which, given that, used at home, was entirely foreseeable. Google did owe a duty to parents to provide them tools to keep their kids safe while they were using these devices at home.

And I will say that whether a school computer provides kids access to the open web, that's not -- not only is that not monitoring, that's not publishing. That is -- I mean, that is a classic design defect, where, if you think about the test, think about risk-benefit. Is -- that would be a question of to have school computers that are fit for purpose for kids as young as five, would that device, would that product need to grant children open, unrestricted access to third-party content and communications by default, or is that unnecessary and unreasonably dangerous under the consumer expectation test? Is that what people, the public, parents would think, that when their child is given a Chromebook, that that means that she has access to all manner of online content and that that would be necessary for her to write her essay or talk to her -- communicate with her friend, or store her, you know, the video that she made for science class, or whatever it is.

And so when you look at it through that frame, it so much

more cleanly fits within the product defect framework than it does within a publishing 230 framework.

**THE COURT:** Thank you, Counsel.

**MS. LIDDELL:** Thank you.

**THE COURT:** The floor is yours, Ms. Bali.

**MS. BALI:** Thank you, Your Honor. There was a lot discussed here. I think much of these points are addressed in our papers.

I'll just say that I'd like to bring us back to the test for 230 application set forth in *Barnes*. It's a three-part test.

The first effort element requires or provides that 230(c)(1) protects a provider or user of an interactive computer service. I think Your Honor said you didn't have questions about that, but there's tons of case law finding that Google is an interactive computer service.

The second element is who treats the -- who a plaintiff seeks to treat as a publisher or speaker. That is the element that's gotten a lot of discussion is today. You know, I think that the case law, the Ninth Circuit case law, has been clear that it doesn't matter how a plaintiff styles their claims. What matters is the duty. And here plaintiffs', all of plaintiffs' claims suggest that Google had a duty to protect MC from harmful online content. That is publisher conduct. That is the heartland of 230.

There is -- the distinctions that counsel is trying to draw between a platform or, you know, the series of products that is at issue in plaintiffs' complaint is a distinction without a difference. I think the cases out of the Ninth Circuit, specifically *Estate Of Bride* and *Doe 1 v. Meta* are directly on point. And, you know, in *Estate of Bride* specifically, the plaintiff's alleged product liability claims, including design defect, negligence, failure to warn, based on the theory that the Yolo app, which allowed users to communicate anonymously, was unreasonably dangerous for minors and that the defendant failed you to disclose the risk of harm to minors. And the Ninth Circuit held that at root, all of plaintiff's product liability theories attempt to hold Yolo responsible for users' speech or Yolo's decision to publish it. That's exactly the same approach that plaintiff is taking here, and I do think that that case is, that binding precedent directly forecloses all of plaintiffs' claims.

And, you know, one other thing that's worth noting is in *Bride*, the Ninth Circuit recognized that the Yolo app merely presented a general possibility of harm which largely exists anywhere on the Internet, and that it couldn't hold Yolo responsible for the unfortunate realities of human nature. Bad things happen on the Internet. There's no dispute about that. The question is whether Google can be held liable and whether there's 230 immunity, given that the focus of plaintiffs'

claims is that Google did not prevent MC or protect MC from accessing harmful content on the Internet. That is publisher conduct.

**THE COURT:** Can I ask you to address more squarely, because I think that if Ms. Liddell had the floor right now, she -- because I think this is akin to a question I asked her, right? That's what I asked. Isn't this just like *Yolo* or *Bride* in that you are essentially asserting that Google has failed to protect the plaintiffs from whatever on the Internet. And I think the response I got back and I would like you to address head on is, no, it's design defect.

**MS. BALI:** It was design defect there, as well. That was the exact same claim that was alleged in *Bride*. And so it doesn't matter what you call the claim. The, what matters is whether you are targeting publisher conduct, and that's what this is. And so, you know, I don't think that that's a distinction that distinguishes this case from *Bride*.

And then lastly, I think the third element of the test is just worth discussing very briefly, because I think that that's where the *Doe v. Meta* case is particularly helpful.

So, you know, there that case makes pretty clear that matching users with content, you know, falls within the -- including recommending content, falls within the scope of publisher conduct, and that does not make a interactive computer service the, you know, creator or developer of that

content, right? And so I don't think there's any question that the harmful conduct or content that MC encountered online was created by a third party, and simply using an algorithm to match MC with that content, assuming, you know, the truth of plaintiffs' allegations, does not --

**THE COURT:** Which we have to at this point.

**MS. BALI:** Which we have to at this point, does not, you know, convert Google in this case from an interactive computer service to a content provider. And that's -- I think this is heartland 230.

I'll also say with respect to the admin. console I think there's -- and we assert in our papers there's also an argument that Google is entitled to immunity under two 230(c)(2)(B), which protects the provision of tools that could be used for filtering objectionable material. That is what the admin. console does, right? It vests schools with the tools to customize how they want their domain to function, including, you know, whether they want certain websites to be accessible or blocked by particular users and their domain. So that falls squarely within the scope of a separate immunity provision.

In addition to (c)(1), I think we'd argue it's also immune under (c)(1).

And with that I think 230 -- this case is open and shut on 230. I'm happy to talk about any of those claim-specific points if you'd like, but ...

**THE COURT:** I just want to confirm. I think it's, right, (c)(2)(B)?

**MS. BALI:** Yes, (c)(2)(B), exactly. Sorry if I misspoke.

**THE COURT:** No. Thank you.

**MS. BALI:** Thank you, Your Honor.

**THE COURT:** Thank you, Ms. Bali.

Ms. Liddell, would you like the last word?

**MS. LIDDELL:** I would just again note how many times the Ninth Circuit has said this is not a but-for test. It is not enough that third-party content is involved. It is, as *Bride* put it, it is an exacting analysis that requires looking very narrowly at the duty at issue. Is it publishing, and if the answer is "no," then no 230. If the answer is "yes," it isn't, then, therefore 230. It's is it monitoring. And nowhere in the defense's briefing does it identify what -- what is the monitoring that we say they failed to do?

And our defect -- the defects, the many defects that we've alleged, how is monitoring the only fix? That is the test. And we say on all of these defects these are not -- no judgment-making, no decision-making is required to cure these. These are architectural issues that exist at every layer of this stack that have to do with allowing kids to access whatever that third-party content is. Here it's porn. It could be anything, anything that's -- you know, it could be

great literature from, you know, throughout time, or it could be hardcore pornography.

And our position is there is not a single defect that we've alleged that requires monitoring. It is all about how it is designing these complex ecosystems to allow kids to use computers safely at school, to do their homework, to do their tests, to talk to their teachers, to get their grades. And we say none of that, none of that requires access to the Internet, let alone specific, any specific platform, any specific website, any specific piece of content or communications. This is a classic product defect.

And again, going through all of these -- I won't. I won't. I'm not going to go through all of the defects. But one other point I would like to make is that, again, the point, a big part of 230 was to protect the free market of ideas, right? To protect, in part, the First Amendment. And I would note that the First Amendment doesn't really exist in the context of publishing -- a publisher's right in K through 12 education. That right, as soon as a publisher targets K through 12 education, they forego that right.

And so I guess I'm just not seeing how it's the case that a publisher, if even that's what Google is -- and here we say Google's not a publisher; Google's a maker of Chromebooks for kindergarteners -- that even if they were a publisher, they would not have the same rights as any of the other defendants

in the 230 cases that didn't target five-year-olds at school, that didn't seek to intentionally exclude parents. They put their wares out on the open market. In many of them they said this isn't for use by kids under 13 or under 18, and here we know that Google knew that, that Google intended that. And that alone -- I mean, that alone sets this case apart from all the other cases.

There is a special duty that arises not only from the fact that it manufactured a physical thing, that is a complex, again, hardware/software-connected thing, a digital echo space, that that would invoke the duty of safe product design like in *Lemmon*. But it also had, by marketing to a captive audience of children at school, it had a special duty arose, a duty of care in targeting that market, in calling these things safe, in not saying this is a portal to the Internet, heads up, and instead saying, touting all of the built-in tools. And nowhere in their marketing did it say online, or Internet, or vast access to all manner of third-party content and communications, and yet the design of its product is that.

And so again I say, as we said in our briefing, if this was just a platform like any other on which, you know, there's sex trafficking and drugs and kid porn and all of that, and Google had gone to schools and said, you know, that's what this is, just a heads up, but if you want your kids to get online and have open access to all this, here you go, that's a

different case. We're probably not here then. I don't think a lot of schools would have bought that product.

And so there were, there are consequences for Google not only targeting this market, but saying this is not a portal to the Internet, this is just so kids can do school. It's a safe digital environment. And so in that sense it's much more like *Internet Brands*, the case that was about the modeling platform, where the Ninth Circuit decided, well, there's no liability for the product defect where a model was lured to a fake audition and was raped, but there was a special relationship, because the platform, the company had knowledge that its platform was being used for that purpose, and because it had that unique knowledge of danger, there was a duty to warn. Well, so, too, here.

Again, had Google said what apparently they say it is now, which is, we're just the Internet, then that's a very different case. But when they target children at school and they say it's for school, for, you know, built-in learning tools, and when they say that it's perfect for K through 12 it steps into a whole lot of duties that none of the other companies, none of the defendants in the entire body of 230 jurisprudence had assumed. And so in that sense this is a very clean no-230 case. We don't even have to get into the weeds of publishing, and is it monitoring, and even though it's very clear none of our defects would require monitoring third-party content. But

we don't even have to get there, because it's so clear that Google, targeting the group that they did, saying what they said and not saying the things they didn't say, but through representations and omissions they assumed a duty that put them outside the protection of 230.

**THE COURT:** Thank you.

**MS. LIDDELL:** All right. Thank you.

**THE COURT:** All right. Counsel, I know that your initial case management conference is also on, but I'm taking the motion to dismiss under submission. I know that there's a difference of opinion between the parties about whether or not a case schedule should be entered pending a ruling on the motion to dismiss, but I'm going to pocket that for now, or meaning essentially I think what this means is I'm siding with Google that I'm not going to enter a case schedule yet. I want to see where this goes. So you can expect that at a later date.

I think that's everything we're doing today, Counsel. So let me ask: Do you all need anything else from me today?

**MS. BALI:** That covers it, Your Honor. Thank you.

**THE COURTROOM DEPUTY:** Thank you all. Have a good afternoon, and happy 4th of July.

(Proceedings concluded at 2:45 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, July 10, 2026

Stephen W. Franklin, RMR, CRR
Official Reporter, U.S. District Court